**Mary E. VERBECK, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 08–357C.

United States Court of Federal Claims.

Feb. 18, 2011.

Steven H. Haney, Haney, Buchanan & Patterson, LLP, Los Angeles, California, for plaintiff.

Steven M. Mager, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Tony West, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, and Bryan G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Lisa M. Flynn, Assistant Regional Counsel, Office of General Counsel, Region X, United States Department of Health and Human Services, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This case arises from a decision by the Public Health Service ("PHS") to terminate Mary Verbeck, a nurse practitioner who served as a Lieutenant Commander in PHS' Commissioned Corps, during her probationary period of employment. Previously, the court had considered, vacated, and remanded a decision by the Board for Correction of PHS' Commissioned Corps Records ("Board"), which had denied Ms. Verbeck's

application to rescind her discharge. *See Verbeck v. United States,* 89 Fed.Cl. 47 (2009). Upon remand, the Board reaffirmed its prior decision that Ms. Verbeck's commission was properly terminated. AR2–R2 to R6 (Correction Board Decision upon Remand Regarding Ms. Verbeck, Case No. 05–015 (Apr. 16, 2010) ("Correction Board's Second Decision")).[1]

Ms. Verbeck has contested that decision by the Board on remand and has filed a renewed motion for judgment upon the administrative record or, alternatively, for an order remanding her case to the Board to allow it to consider additional evidence. First, Ms. Verbeck alleges that her termination was improper, primarily because no adverse comments about her performance had been incorporated in her Commissioned Officer Effectiveness Reports ("COERs"), that no COER had been prepared regarding the last year of her service, and that she had not been counseled about any performance deficiencies. Pl.'s Mot. for Judgment upon the Administrative Record at 25–29 ("Pl.'s Mot."); Pl.'s Resp. and Opp'n to Def.'s Cross–Mot. ("Pl.'s Resp.") at 8–9. Second, Ms. Verbeck avers that she was entitled to consideration for disability separation by a Medical Review Board ("MRB") due to complications she suffered in connection with breast cancer surgery she underwent in 2001, and the ensuing severe depression from which she was suffering at the time of her termination. Pl.'s Mot. at 13–19.

The government has responded by filing a cross-motion for judgment upon the administrative record. Regarding Ms. Verbeck's claims that her discharge was improper and that she was entitled to disability separation, the government contends that the Board properly considered the entire record and

that its decision is supported by substantial evidence and accords with governing regulations. Def.'s Cross–Mot. for Judgment upon the Administrative Record, and Resp. to Pl.'s Mot. at 11–13 ("Def.'s Cross–Mot.").

The court held a hearing on the pending cross-motions on February 1, 2011. The competing motions accordingly are ready for disposition.

## FACTS[2]

### A. *Ms. Verbeck's Service as a Nurse Practitioner with PHS' Commissioned Corp.*

PHS' Commissioned Corps provides medical services to a variety of federal entities including the Immigration and Naturalization Service ("INS"), the Bureau of Prisons, the Department of Defense, the Indian Health Service, and the Food and Drug Administration. Hr'g Tr. 38:21 to 39:20 (Feb. 1, 2011).[3] From November 1999 until June 2002, Ms. Verbeck was a Nurse Practitioner with the PHS' Commissioned Corps. *Verbeck,* 89 Fed.Cl. at 50–51; AR–410 (Chronology). Ms. Verbeck began her service at an INS processing center located in Queens, New York. *Verbeck,* 89 Fed.Cl. at 51. In October of 2000, Ms. Verbeck requested a transfer from the Queens facility because "she had some difficulties adjusting to that site." AR–486 (Aff. of Captain Eugene A. Migliaccio, Director of the Division of Immigration Health Services (Jan. 31, 2003)). Shortly thereafter, Ms. Verbeck was assigned to the INS processing center in San Pedro, California, at which she spent the remainder of her tenure in the PHS. *Verbeck,* 89 Fed.Cl. at 51.

---

1. In the prior round of proceedings in this court, an administrative record was filed in accordance with Rule 52.1(a) of the Rules of the Court of Federal Claims ("RCFC"). A second administrative record was filed with the court on June 4, 2010 respecting the proceedings before the Board on remand. References to the first administrative record are designated as "AR–__," while those on remand are to "AR2–__." The pages of each administrative record are paginated sequentially.

2. The recitation of facts is drawn from the administrative record. *See Bannum, Inc. v. United States,* 404 F.3d 1346, 1357 (Fed.Cir.2005) ("The [c]ourt ... is required to make factual findings under [what is now RCFC 52.1] from the record evidence as if it were conducting a trial on the record."). A more detailed factual account is provided in this court's prior decision. *See Verbeck,* 89 Fed.Cl. at 51–58.

3. Subsequent citations to the transcript of the hearing held on February 1, 2011, will not include the date.

On September 4, 2001, Ms. Verbeck was diagnosed with breast cancer. *Verbeck,* 89 Fed.Cl. at 51. Thereafter, she underwent a mastectomy, and, due to complications, endured a second surgery on January 4, 2002. *Id.* at 52. As a result of her cancer, surgeries, and complications, Ms. Verbeck began to suffer from "Major Depression, single episode." AR–249 (Letter from Dr. Kathleen A. Frenchen, Ms. Verbeck's treating physician, to Dr. David G. Hopper, Captain, United States PHS, Senior Medical Evaluations Officer (Feb. 27, 2002)).

Upon Ms. Verbeck's return to work in early 2002, her depression was aggravated by two workplace incidents during which she felt that her physical safety was threatened by detainees. *Verbeck,* 89 Fed.Cl. at 52. At about the same time, Ms. Verbeck submitted to one of her two superiors, Commander Yvonne Anthony, Health Services Administrator of the San Pedro facility,[4] a list of possible OSHA violations that Ms. Verbeck believed were occurring at the facility. *Id.*[5]

On February 7, 2002 and February 12, 2002, Ms. Verbeck failed to report to work. *Verbeck,* 89 Fed.Cl. at 52–53. Each time, Ms. Verbeck provided a note from her physician who, after evaluating her over the telephone, concluded that Ms. Verbeck was suffering from major depression that was being exacerbated by workplace stressors and harassment. *Id.* at 53. As a result of Ms. Verbeck's diagnosis and the lack of an in-person clinical evaluation, Ms. Verbeck's PHS superiors expressed concern over the propriety of allowing her to treat patients. *Id.* Accordingly, on February 14, 2002, Ms. Verbeck was informed that she would be placed on paid leave until she obtained medical documentation based upon a formal evaluation releasing her to perform full duty. *Id.*

On February 15, 2002, Ms. Verbeck provided medical documentation stating that although she continued to suffer from major depression, she could "return to work full duty." AR–393 (Physician's Correspondence (Feb. 15, 2002)). On that same day, Commander Anthony sent a letter to Commander William Atwood, Medical Affairs Branch, United States PHS, expressing her opinion that Ms. Verbeck "pose[d] a serious risk to the safety of herself, fellow employees, and patients." AR–371 (Letter from Commander Anthony to Commander Atwood (Feb. 15, 2002)).

On February 16, 2002, Ms. Verbeck filed a discrimination complaint with the Office of Equal Opportunity and Civil Rights ("EEO Complaint"), alleging that her superiors' demands regarding her medical documentation constituted discrimination on the basis of "'perceived' physical or mental disability." AR–631 (Letter from Ms. Verbeck to Patricia J. Mackey, Director, HRSA Office of Equal Opportunity and Civil Rights (Feb. 16, 2002)). Additionally, on February 18, 2002, Ms. Verbeck sent a letter to OSHA recounting the list of potential health and safety violations at the San Pedro INS facility that Ms. Verbeck had previously reported to Commander Anthony. *Verbeck,* 89 Fed.Cl. at 54.

Ms. Verbeck returned to work on February 19, 2002. *Verbeck,* 89 Fed.Cl. at 54. That same day, Commander Anthony and Commander Sowinski set forth the reasons they believed that Ms. Verbeck's "continued presence in the facility [was] detrimental to the functioning, productivity, and staff morale" of the San Pedro facility. AR–369 (Mem. from Commander Anthony and Commander Sowinski to Commander Phil Jarres, Acting Chief, Field Operations (Feb. 19, 2002)). One day later, Ms. Verbeck was informed that she was being "directed into a nonduty with pay status for a period not to exceed 60 days, unless extended, pending receipt of a second opinion evaluation by the Medical Affairs Branch." AR–396 (Letter

---

4. Ms. Verbeck's other superior was Commander Kenneth Sowinski, the Medical Director of the facility. *See Verbeck,* 89 Fed.Cl. at 52 n. 3.

5. Ms. Verbeck's allegations were investigated, and the facility was ultimately determined to be in compliance with OSHA's standards. *Verbeck,* 89 Fed.Cl. at 52. The final report of the investigation concluded that Ms. Verbeck was not "following established procedure, nor [was] she well versed in her role as the infection control officer of [the] facility." *Id.* (quoting AR–367 (Letter from Commander Alysse Gordon, Assistant Health Services Administrator, to Commander Anthony (Feb. 11, 2002))).

from Commander Anthony to Ms. Verbeck (Feb. 20, 2002)). Ms. Verbeck subsequently updated her then-pending EEO complaint to include an allegation of retaliation, claiming that her placement on "nonduty with pay status" was reprisal for her EEO complaint and letter to OSHA. *See* AR–687 to 688 (Letter from Patricia Mackey to Ms. Verbeck (Feb. 25, 2002)).[6]

In late February and early March, two physicians independently conducted reviews and provided a clinical evaluation of Ms. Verbeck's psychiatric condition. Ms. Verbeck's physician, Dr. Kathleen Frenchen, informed PHS that she had been treating Ms. Verbeck for major depression since November 9, 2001, and that although developments at the San Pedro facility had exacerbated her condition, Ms. Verbeck was psychiatrically fit for full duty. AR–249 (Letter from Dr. Frenchen to Dr. Hooper (Feb. 27, 2002)). Thereafter, Ms. Verbeck was evaluated by Captain William Nash, a Navy doctor, who concluded that although Ms. Verbeck was "psychiatrically fit for full duty ... [g]iven her stresses and the obvious [e]ffects they have on her emotional state and interpersonal functioning ... consideration should be given to transferring her to a less stressful work environment." AR–190 to 191 (Letter from Captain Nash to Commander Atwood (Mar. 7, 2002)).

On March 21, 2002, Ms. Verbeck was informed that she would "continue in a nonduty with pay status pending an administrative investigation." AR–398 (Letter from Commander Anthony to Ms. Verbeck (Mar. 21, 2002)). Shortly thereafter, Dr. Eugene Migliaccio, Director of the Division of Immigration Health Services, requested Ms. Verbeck's immediate separation from service "for reasons of unsuitability and for failure to demonstrate the level of performance, conduct, and dedication to duty expected of an officer in the Uniformed Services." AR–338 (Mem. From Dr. Migliaccio to Rear Admiral Michael Davidson, Director, Division of Commissioned Personnel ("DCP") (Apr. 4, 2002)). Ms. Verbeck was notified on May 1, 2002

that her commission was being terminated, effective June 1, 2002. *Verbeck,* 89 Fed.Cl. at 56.[7]

On May 30, 2002, Ms. Verbeck requested through counsel that Rear Admiral Davidson, Director, DCP, rescind the termination letter or "delay her termination until she can complete medical care that she very much needs or allow her to be considered for a medical discharge." AR–261 (Letter from David P. Sheldon, Attorney for Ms. Verbeck, to Rear Admiral Michael Davidson (May 30, 2002)). That letter cited Ms. Verbeck's ongoing care resulting from her cancer, mastectomy, reconstructive surgery, and depression, and her scheduled surgical procedures to address uterine abnormalities as evidence that Ms. Verbeck was not fit to be discharged at that time and was eligible to be considered for a medical discharge. AR–261 to 263. Ms. Verbeck's request was rejected, and she was terminated effective June 1, 2002. *See* AR–266 (Letter from Rear Admiral Davidson to Mr. Sheldon (June 17, 2002)).

### B. *The First Administrative Proceeding*

On April 9, 2003, Ms. Verbeck filed suit in this court alleging that PHS had improperly terminated her and had wrongfully denied her a disability retirement. *Verbeck,* 89 Fed. Cl. at 56. Because Ms. Verbeck had failed to submit an application to the Board prior to filing in this court, the parties entered into a joint stipulation of dismissal. *Id.* at 57. Ms. Verbeck thereafter submitted an application to the Correction Board. *Id.*

On March 28, 2007, the Board issued a decision rejecting Ms. Verbeck's application. AR–431 to 433 (Correction Board Final Decision Regarding Ms. Verbeck, Case No. 05–515 (Mar. 28, 2007)). The Board determined that at the time Ms. Verbeck was separated, she had been found fit for full duty, and was thus ineligible for disability retirement. AR–432. The Board additionally concluded that documentation submitted by the INS showed that Ms. Verbeck's commission was properly

---

**6.** Ms. Verbeck's EEO complaint was ultimately dismissed. *See Verbeck,* 89 Fed.Cl. at 54–55.

**7.** In response to her termination, Ms. Verbeck filed a second EEO complaint, claiming that her

termination was in retaliation for her previous EEO complaint in February. *Verbeck,* 89 Fed.Cl. at 56. Ms. Verbeck's second complaint was ultimately dismissed. *Id.*

terminated for reasons of unsuitability and for reasons of failure to demonstrate the proper level of performance and conduct. *Id.* The Board alternatively held that it lacked jurisdiction over Ms. Verbeck's case because Ms. Verbeck was detailed to an INS facility at the time of her separation, and the Board had no jurisdiction over INS personnel activities. *Id.*

### C. *Prior Judicial Decision*

Ms. Verbeck thereafter filed her second complaint in this court, claiming that her termination was wrongful and was the result of reprisal, that she was improperly discharged without receiving a fitness-for-discharge physical prior to her termination, and that the Board's decision was arbitrary and capricious. *Verbeck,* 89 Fed.Cl. at 50–51.

The court first interpreted and applied 42 U.S.C. § 213a and held that it lacked jurisdiction over Ms. Verbeck's allegations of retaliatory termination based on her EEO and OSHA complaints because, as a member of the PHS' Commissioned Corps, Ms. Verbeck was not entitled to any statutory protection for whistleblowers nor was she eligible for the protections provided by the Americans with Disabilities Act, 42 U.S.C. § 12203(a). *Verbeck,* 89 Fed.Cl. at 61–62.

Respecting the merits of Ms. Verbeck's improper termination claim, the court determined that the Board's failure to consider Ms. Verbeck's COERs, which provided remarkably positive reviews of her professional performance, coupled with a corresponding failure to consider the awards Ms. Verbeck had received during her tenure with the PHS, demonstrated that the Board had not considered all relevant aspects of Ms. Verbeck's service. *See Verbeck,* 89 Fed.Cl. at 65–66. Correlatively, the court found that the Board omitted to address evidence casting potential doubt on the authenticity of Commander Sowinski's initials on the memorandum ostensibly from Commander Anthony and Commander Sowinski dated February 19, 2002, which provided much of the reasoning behind Ms. Verbeck's termination. *Id.* at 66. The court additionally found that the Board's determination that it lacked jurisdiction over Ms. Verbeck's claims due to her assignment to an INS facility was "clear-ly erroneous[,]" as Ms. Verbeck was at all times an officer in the PHS' Commissioned Corps and had been, in fact, terminated by PHS. *Id.* at 67.

The court also concluded that the Board erred in its consideration of Ms. Verbeck's disability separation claim due to its failure to consider evidence of significant impairment that had arisen during the course of Ms. Verbeck's tenure with the PHS' Commissioned Corps. *See Verbeck,* 89 Fed.Cl. at 69–70. The court particularly noted that although the Board had emphasized an evaluation of Ms. Verbeck by her treating physician that concluded that she was fit for duty, it had ignored the evaluation done by Captain Nash in March of 2002, which indicated that Ms. Verbeck was suffering from a variety of ongoing mental and physical health difficulties which impaired her functioning as a nurse practitioner in Ms. Verbeck's then-current assignment. *Id.* Because "[c]orrection boards are 'competent to make a disability determination in the first instance[,]' " the court directed that the Board make such a determination or cause such a determination to be made. *Id.* at 70 (quoting *Sawyer v. United States,* 930 F.2d 1577, 1581 (Fed.Cir. 1991)).

The court consequently vacated the Board's decision and remanded the case to the Board with instructions to consider anew "whether the termination of Ms. Verbeck's commission was appropriate and whether she should have been separated with a severance payment based on disability." *Verbeck,* 89 Fed.Cl. at 70.

### D. *Administrative Proceedings on Remand*

On April 16, 2010, the Board issued its second decision, again rejecting Ms. Verbeck's application. AR2–R2 to R6 (Correction Board's Second Decision). As to Ms. Verbeck's claim that she was entitled to disability separation, the Board stated that it was "neither qualified to make a medical determination of [Ms. Verbeck's] fitness for duty nor determine whether or not she should have been referred to a Medical Review Board (MRB) for evaluation." AR2–R4. The Board then commented on "the issue of

referring an officer to a [MRB] within the limits of the mechanisms for convening a MRB to evaluate an officer." *Id.*

The Board stated that neither Ms. Verbeck nor her program officials requested an MRB. AR2–R4 (Correction Board's Second Decision). The Board also noted that a referral could be made by the Office of Commissioned Corps Operations ("OCCO") but indicated that such a referral is "directed when an officer uses excessive sick leave in a 12–month period or if an officer has a medical condition that is disabling or otherwise places the officer or others in jeopardy if the officer continues on active duty." AR2–R4. The Board found that an OCCO referral was not appropriate for Ms. Verbeck because neither of these criteria was present and concluded that Ms. Verbeck's medical conditions "did not warrant convening a MRB." *Id.* The Board noted that although Ms. Verbeck "had a variety of medical issues" and Captain Nash had "indicated that her condition was exacerbated by her work assignment," Captain Nash also determined that she was "fit for duty." *Id.*[8]

The Board also denied Ms. Verbeck's claim of improper termination. After noting that Ms. Verbeck was transferred from the Queens facility to the San Pedro facility due to "unspecified difficulties adjusting to the work environment[,]" the Board concluded that "[t]he determination of unsuitability was based on behavioral issues that had surfaced in Ms. Verbeck's first assignment." AR2–R5 (Correction Board's Second Decision). The Board additionally found that "[t]he determination of failure to demonstrate the level of performance, conduct, and dedication to duty expected of an officer was based on her failure to resolve health and safety issues throughout the medical unit as the infection control officer, [Ms. Verbeck's] not being receptive to supervision[,] and [her] difficult[y] working with others." *Id.* Although the

Board recognized that "Ms. Verbeck had numerous awards and excellent officer efficiency ratings through 2001[,]" and that the emergence of her behavioral issues "appear[ed] to coincide with the onset of surgery and ensuing complications[,]" the Board discounted the potential importance of these facts because "similar concerns had resulted in her transfer from the Queens DIHS facility and there was no evidence of an onset of medical issues associated with her behavioral issues [in that facility]." *Id.*

After concluding that Ms. Verbeck's termination followed appropriate procedures, the Board decided that although her "past performance record and illness would certainly be considered mitigating circumstances," those factors "are not determinative absent an error in record." AR2–R5 (Correction Board's Second Decision). As for the dispute concerning the authenticity of Captain Sowinski's initials on the March 2002 memorandum requesting Ms. Verbeck's termination, the Board stated that it had verified "via sworn statement" that Captain Sowinski "did in fact initial the request and it was not a forgery." *Id.*[9]

## STANDARDS FOR DECISION

■ In reviewing the parties' cross-motions for judgment upon the administrative record pursuant to Rule 52.1(c), "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof, based on the evidence in the record." *A & D Fire Prot., Inc. v. United States,* 72 Fed.Cl. 126, 131 (2006) (citing *Bannum,* 404 F.3d at 1356). Facts that are in contention will not preclude judgment on a motion made under Rule 52.1(c); rather, the court resolves such questions by reference to the administrative record. *See Bannum,* 404 F.3d at 1356–57.[10]

---

8. Subsequent to Ms. Verbeck's termination, she received a disability rating of 50% from the Veterans Administration. Pl.'s Statement of Facts ¶ 38(d). The Board rejected Ms. Verbeck's claim that this rating was persuasive evidence of her entitlement to disability separation, because "the criteria for VA disability award and for a disability retirement are not analogous." AR2–R4 (Correction Board's Second Decision).

9. The Board also addressed its erroneous prior determination that it lacked jurisdiction over Ms. Verbeck's claim because she was assigned to an INS facility, stating that "[t]he Board has authority to direct the Corps to take corrective action regardless of where the officer is assigned." AR2–R5.

■ The substance of military decisions, particularly determinations as to suitability to serve, is largely beyond the appropriate domain of the judiciary. *See Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir.1983); *see also Melendez Camilo,* 89 Fed.Cl. at 678. This deference to the traditionally exclusive province of executive authority in matters of military service, however, does not insulate such decisions from judicial review; rather, "a challenge to a particular procedure followed by the military in rendering a decision may present a justiciable issue." *Fisher v. United States,* 402 F.3d 1167, 1177 (Fed.Cir. 2005); *see also Lindsay v. United States,* 295 F.3d 1252, 1257 (Fed.Cir.2002) ("The military no less than any other organ of the government is bound by statute, and even when granted unfettered discretion by Congress the military must abide by its own procedural regulations should it choose to promulgate them."). Accordingly, "[w]hen there is a question of whether reasonable process has been followed, and whether the decision maker has complied with established procedures, courts will intervene, though only to ensure that the decision is made in the proper manner." *Fisher,* 402 F.3d at 1177.

■ The court's review in these matters is thus limited in scope and deferential in nature. Ms. Verbeck must show that the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence. *See Chambers v. United States,* 417 F.3d 1218, 1227 (Fed.Cir.2005); *Godwin v. United States,* 338 F.3d 1374, 1378 (Fed.Cir.2003); *Heisig,* 719 F.2d at 1156. Under this standard, the court must ask "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 104–05, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The Board's decision will comply with the substantial evidence standard so long as a

" 'reasonable mind might accept' [the] particular evidentiary record as 'adequate to support [the contested] conclusion.' " *Dickinson v. Zurko,* 527 U.S. 150, 162, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (quoting *Consolidated Edison Co. of N.Y. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Similarly, the arbitrary and capricious standard "requires a reviewing court to sustain an action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir.2000).

■ In sum, the court must satisfy itself that the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it. *See Heisig,* 719 F.2d at 1157 ("Under the substantial evidence rule, *all* of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion."); *Van Cleave v. United States,* 70 Fed.Cl. 674, 678–79 (2006) (While the court does not "serve as a 'super correction board[,]' *Skinner v. United States,* [594 F.2d 824, 830 (Ct.Cl.1979) ] ... correction boards must examine relevant data and articulate satisfactory explanations for their decisions.") (citations omitted). If the Board "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [Board], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" its decision runs afoul of even this lenient standard of review. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

## ANALYSIS

### I. VALIDITY OF MS. VERBECK'S TERMINATION

#### A. *Whistleblower Protection and Disability Discrimination*

In her motion and initial briefing, Ms. Verbeck appeared to renew her claim that her

---

**10.** The decision in *Bannum* was based upon the version of RCFC 56.1 that existed at the time. Subsequently, RCFC 56.1 was abrogated and replaced by RCFC 52.1, which incorporated sub-

stantial aspects of the *Bannum* decision. *See Melendez Camilo v. United States,* 89 Fed.Cl. 671, 677–78 n. 4 (2009).

termination was unlawful retaliation for her OSHA and EEO complaints. *See* Pl.'s Mot. at 1, 5–13. In response to the government's cross-motion, however, Ms. Verbeck asserts that she is not reinstituting these claims but rather the "EEO and whistleblowing facts have been asserted merely to establish that [Ms. Verbeck] was wrongfully separated." Pl.'s Resp. at 6. This is a distinction without a difference. In the court's prior opinion, it held that it lacked jurisdiction over these claims because as a member of the PHS' Commissioned Corps, Ms. Verbeck was not entitled to the statutory protection afforded to whistleblowers or those alleging disability discrimination. *See Verbeck*, 89 Fed.Cl. at 61–62. Ms. Verbeck may not sidestep the preclusive impact of the court's prior decision by arguing that the same facts that would have served as her evidence of whistleblower and disability discrimination claims now merely constitute the factual predicate to a generic wrongful termination claim.

██ Nonetheless, in support of her factual-predicate argument, Ms. Verbeck points to provisions within the PHS' Personnel Manual which state that officers shall be free of reprisal and discrimination based on disability, among other things. Pl.'s Mot. at 6–7; AR2–R67 to 68 (eCCIS CC26.1, Instruction 6, Sections D(7) and E(1)).[11] When viewed in light of the explicit exclusion of the PHS' Commissioned Corps from any statutory protections on these matters, *see Verbeck*, 89 Fed.Cl. at 61–62, the Manual's creation of an internal procedure to deal with such allegations cannot be read to provide a basis for a judicially enforceable claim.[12] To do so would ignore not only the pertinent statutory provisions but also the dictates of the Manual itself. *See Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed.Cir.2010) (Courts "must give effect to the unambiguously expressed intent of Congress." (quoting

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984))); *see also* AR2–R68 (eCCIS CC26.1, Instruction 6, Section E($l$)) ("[A]s members of a Uniformed Service, commissioned officers are not covered by laws related to discrimination.").

### B. Commissioned Officer Efficiency Reports

1. *The Board's consideration of Ms. Verbeck's COERs.*

██ Ms. Verbeck argues that the Board's decision was arbitrary and capricious because "none of the behavioral incidents [cited as cause for her termination] were made a part of [her] COERs which clearly established that [her] ratings were exceptional through June of 2001, and the Board failed to recognize that to exclude the behavioral assertions from the COERs not only violates USPHS policy but is an error in the record." Pl.'s Mot. at 25; *see also id.* at 27. The Board dismissed any temporal connection between Ms. Verbeck's alleged behavioral issues and her medical difficulties by referring to notes and recollections about Ms. Verbeck's interactions with other PHS personnel that occurred prior to her illnesses and surgeries:

> Ms. Verbeck had numerous awards and excellent officer efficiency ratings through 2001. The Board also notes that issues with Ms. Verbeck's behavior, performance of duties, response to supervision, and difficulty working with others appear to coincide with the onset of surgery and ensuing complications. However, the Board also notes that similar concerns had resulted in her transfer from the Queens DIHS facility and there was no evidence of an onset of medical issues associated with her behavioral issues.

---

**11.** This regulation is a part of the Electronic Commissioned Corps Issuance System (thus "eCCIS"), formerly known as the Commissioned Corps Personnel Manual. *See Verbeck*, 89 Fed. Cl. at 63 n. 14. The eCCIS are publicly available through the internet at http://dcp.psc.gov/eccis. They are not published in the *Federal Register*.

**12.** Additionally, the regulatory provisions do not provide the Board with jurisdiction to review the

complaint; the Surgeon General is charged with rendering a final decision. AR2–R77 to R78 (eCCIS CC26.1, Instruction 6, Section F(2)(f)(1)(a)). Ms. Verbeck "acknowledges that this [c]ourt and the Board do not have jurisdiction to overturn the Surgeon General's decision relative to [Ms. Verbeck's] EEO claims." Pl.'s Resp. at 14 n. 4.

AR2–R5.[13] Ms. Verbeck is correct that none of the subjects of those notes and recollections about early behavioral issues are reflected in her COERs. The government nonetheless avers that "the reasons for Ms. Verbeck's termination are well documented in the administrative record[,]" and that the Board "[p]roperly [c]onsidered [t]he [e]ntire [r]ecord, [i]ncluding Ms. Verbeck's [p]ositive [p]erformance [e]valuations." Def.'s Cross–Mot. at 15, 21.

The PHS Personnel Manual emphasizes that COERs must be "candid and objective" because they are used respecting "assignment, promotion, and retention:"

> The COER is extensively used in the evaluation of officers for various personnel actions. . . . *The COER is also basic to fulfilling an important supervisory responsibility,* that of the discussion of an officer's performance with him/her. Such discussions provide officers with an opportunity to assess their strong and weak points, and overcome perceived performance and/or attitudinal deficiencies, in order to increase their value to the Service. . . . It is PHS policy that an officer's evaluation must be discussed with him/her in a formal manner at least once annually, and more frequently, if appropriate. In all instances, the officer's immediate supervisor must discuss the evaluation with the officer. . . . Moreover, the COER is utilized by DCP as an adjunct in processing both positive and adverse actions that are initiated by program officials. Therefore, *it is imperative both to the officer and to the Service that reports be candid and objective.* Since COERs are often the basis for personnel actions involving assignment, promotion, and retention, raters are reminded that it is expected that problems and/or difficulties shall be documented.

AR2–R35 (eCCIS CC25.1, Instruction 1, Section C(2–4)) (emphasis added). Either this "basic" and "imperative" instruction regarding COERs was not followed by Ms. Verbeck's supervisors, or Ms. Verbeck's difficult relationships with her supervisors and peers arose in concert with her medical infirmities. Either way, the Board manifestly erred in its assessment of the evidence by failing to deal with the blatant contradictions between the uniformly favorable COERs and the disparaging commentary.

There is sparse documentation—which was prepared after Ms. Verbeck's separation had been requested—reporting that Ms. Verbeck experienced behavioral problems at the Queens facility. *See* AR–R221 (Mem. from Captain Jim Imholte, Health Services Administrator, to Captain Janet Dumont, Assistant Director (Mar. 12, 2002)) (stating that Ms. Verbeck had improperly requested her brother, an Air Force Colonel, to intervene on her behalf in an INS matter, and characterizing Ms. Verbeck as "a very moody person . . . who at times could be difficult"); AR–R222 (Mem. from Captain Neal Collins to Captain Jan Dumont (Apr. 4, 2002)) (noting Ms. Verbeck's objection to performing routine nursing duties, her numerous episodes of crying, her refusal to submit her security clearance to INS, and her "very poor relationships with her peers[,]" including her argumentativeness and frequent complaints).[14] However, Ms. Verbeck's 2000 COER, prepared while she was at the Queens facility, states that Ms. Verbeck "consistently performed her functions in a prompt and professional manner[,]" and that she "has developed innovat[ive] ways to maximize productivity of the clinic staff." AR–174 (Ms. Verbeck's COER for 2000). Ms. Verbeck's overall work performance for this period was rated as "[e]xceptional" meaning that her "performance is far better than can

---

**13.** Ms. Verbeck raises specific evidentiary objections to the notes and recollections for the first time before this Court. *See* Pl.'s Resp. at 9–11. Because Ms. Verbeck failed to raise these evidentiary objections before the Board, she is precluded from raising these issues in the first instance before this court. *See Murakami v. United States,* 398 F.3d 1342, 1354 (Fed.Cir.2005).

**14.** Included within the record as well is a page of handwritten notes, author unknown, dated April 28, 1999, which apparently recites the substance of a phone call from Captain Neal Collins relaying Ms. Verbeck's "emotional, paranoid behavior." AR2–R220. The Board did not address these notes and, on review, the court cannot afford substantial evidentiary weight to a photocopy of hand-scribbled notes that do not reveal the identity of the author.

be reasonably expected and has brought credit on the officer and the organization." AR–176 (Ms. Verbeck's COER for 2000). Perhaps most at odds with the recitations contained in the memoranda from Captain Collins and Captain Imholte that were prepared several years after the fact, Ms. Verbeck's 2000 COER concluded that she "works to *enhance relationships with coworkers* [and] [w]orks with others in ways which *maximize contributions of each person* and consistently produces excellent results[,]" and that she "enhanced her posit[ion] through *a team approach to work related issues resulting in a positive work environment.*" AR–174, 176 (Ms. Verbeck's COER for 2000).

Ms. Verbeck's subsequent COER, prepared in June of 2001, equally is discordant with PHS' account of her behavior at the San Pedro facility. The February 19, 2002 memorandum that requested Ms. Verbeck's separation states that "[w]ithin four months after arrival at this facility ... [Ms.] Verbeck required verbal counseling due to her behavior and its effect on the staff and productivity of this clinic." AR–369 (Mem. from Commander Anthony and Commander Sowinski to Commander Phil Jarres, Acting Chief, Field Operations (Feb. 19, 2002)). That behavior reportedly included Ms. Verbeck's creation of a "hostile work environment[,]" her paranoia, her bossiness, her condescending nature to her colleagues, and her effect of "decreasing productivity[.]" *Id.* Ms. Verbeck's COER for this exact period states that she "*gets the most out of all employees supervised*[,] that she "[i]s *able to cooperate with others in a manner that helps produce better work than any one member of the group could produce [,]* " and that "[t]hrough mutual brainstorming *[she] attempts to achieve the maximum efficiency for distribution of the daily work-*

*load.*" AR–167 (Ms. Verbeck's COER for 2001) (emphasis added). The 2001 COER also provided that Ms. Verbeck "*[w]orks with supervisory guidance constructively[,]* " [i]ntegrates personal and program interests so that *conflicts rarely arise*[,]" and that she is "an asset to [the] division and the USPHS." AR–168, 171 (Ms. Verbeck's COER for 2001) (emphasis added). The rater ended the COER by stating that "[w]ithout any reservations, I support her further career advancement in the USPHS." AR–171 (Ms. Verbeck's COER for 2001).

The dissonance between Ms. Verbeck's COERs and her supervisors' subsequent commentary regarding her behavior over the time from 1999 to 2001 is confounding. More importantly, it runs directly contrary to the regulations governing COERs, which demand that COERs include candid evaluations that encompass the positive and negative aspects of an officer's performance. AR2–R35 (eCCIS CC25.1, Instruction 1, Section C(2–4)).

No explanation for, or appropriate resolution of, the discrepancy appears on the record before the court. *See Frizelle v. Slater,* 111 F.3d 172, 179 (D.C.Cir.1997) (observing that a Board must give "appropriate weight" to competing evidentiary submissions).[15] The Board's failure to address that divergence cannot be sustained.

### 2. *Three-year file review.*

Ms. Verbeck additionally contends that the Board erred in denying her claims that PHS failed to follow the regulations governing review by COERs and otherwise during an officer's last year of probation. *See* Pl.'s Mot. at 22–23; Pl.'s Resp. at 7–8. The government asserts that because Ms. Verbeck was terminated for cause and not involuntarily separated at the conclusion of her three-

---

**15.** The record reveals no instances of behavioral problems or complaints for nearly the entire year preceding Ms. Verbeck's return to work in January of 2002 following her cancer treatment. *See* AR–375 to 376 (Letter from Commander Anthony to Commander Atwood (Feb. 15, 2002)). This circumstance lends significant credence to Ms. Verbeck's claim that any behavioral problems that actually precipitated her termination were a result of her illness. Captain Nash's evaluation substantiates this claim as well. He wrote of Ms. Verbeck, "[S]he has no history of significant impairment of her occupational or social functioning in the past because of these traits [of sensitivity to criticism, perfectionism, and defensiveness,] [and] [i]t seems clear from her history ... that a number of situational stressors have greatly affected her mental and emotional state over the past several months." AR–189 (Letter from Captain Nash to Commander Atwood (Mar. 7, 2002)).

year probationary period, the regulations governing review during an officer's third year of probationary service do not apply. Def.'s Cross–Mot. at 24.

PHS regulations dictate that "[p]rior to completion of the 3–year probationary period, each officer *will be reviewed*" according to a detailed timeline. AR2–R51 (eCCIS CC23.7, Instruction 1, Section E(5)) (emphasis added). Twelve months prior to the end of an officer's probation, the officer must be notified that he or she is entering his or her final year of probationary service. *Id.* (Section E(5)(a)). No later than nine months prior to the conclusion of an officer's probationary period, the operating division or program "*will review the performance and conduct of officers* covered by the notice, and will make a recommendation to DCP regarding each officer's retention beyond probation." *Id.* (Section E(5)(b)) (emphasis added).[16] "Special request" COERs are governed by eCCIS CC25.1, Instruction 1, Section G(4)(a), which provides that "*DCP will request that a COER be completed when an officer is subject to a three-year file review,* requests assimilation, or is being considered for involuntary retirement or other nonroutine action." AR2–R40 (emphasis added).[17]

Ms. Verbeck entered her final year of probation on November 1, 2001. *See* Pl.'s Statement of Facts ¶ I(2) (noting Ms. Verbeck's entry into service with PHS on Nov. 1, 1999). Thus, by February 1, 2002—nine months prior to the end of her probationary service— the operating division or her program was required to conduct a formal review of Ms. Verbeck's performance by way of a COER. In the government's view, however, the failure of Ms. Verbeck's supervisors to do so is

of no import because "[t]he program to which an officer is assigned is 'responsible for initiating separation action *whenever* it becomes apparent during the probationary period that the officer's performance or conduct is below a level desirable for continued service." Def.'s Cross–Mot. at 24 (quoting AR2–R50 (eCCIS CC23.7, Instruction 1, Section E(2)(a))) (emphasis added).

The government's interpretation of the relationship between eCCIS CC23.7, Instruction 1, Section E(2)(a), and those governing the procedures required during an officer's third year of probation is erroneous. While a program may initiate a separation action at any time during an officer's probationary period, including during the final year, any such decision neither displaces nor excuses the program's failure to initiate and pursue the third-year file review process. In fact, the regulations contemplate the exact situation of an individual separation action arising during an officer's final year of probation. They state:

> It is possible that an officer could be in some stage of the group [third-year] review process when an individual case is initiated by the OPDIV or Program. If an individual case is under consideration while a group review is in process, the individual case will take precedence, and the group review for that particular officer need not be continued.

AR2–R50 (eCCIS CC23.7, Instruction 1, Section E(2)). Under the regulations, Ms. Verbeck was plainly entitled to the three-year file review procedures, including notification of entry into her third year of probation and a COER performed by February 1, 2002, until such time as PHS requested her termi-

---

**16.** The regulations reiterate the critical nature of accurate COERs leading up to an officer's final probationary year, providing that "[s]upervisors of commissioned officers must insure that their ratings of officers' performance and conduct during the probationary period are consistent with the recommendations which they will make regarding retention beyond the probationary period." AR2–R50 (eCCIS CC23.7, Instruction 1, Section E(2)(b)).

**17.** The government cites to the United States Department of Health and Human Services' Commissioned Officer's Handbook, which pro-

vides that "DCP may direct that a COER be submitted under certain circumstances, including 3–year file review ... or other nonroutine action," as evidence that a COER is not necessarily required for these actions. Def.'s Reply 8–9 (citing Def.'s Reply App. 4). However, the first sentence of that provision states that "[s]pecial [r]equests for COERs *are made* by DCP as part of the 3–year file review process ... or other nonroutine action[.]" Def.'s Reply App. 4. Moreover, the provision actually contained within the PHS Manual specifies that DCP is required to request a COER under the listed circumstances.

nation. Ms. Verbeck's termination was not requested until April 4, 2002, AR–338 (Mem. from Dr. Migliaccio to Rear Admiral Michael Davidson, Director, DCP (Apr. 4, 2002)), nearly five months after she entered her third year of probation, and during this time, she received no COER and none of the review required by eCCIS CC23.7, Instruction 1, Section E.

### 3. *Non-routine action.*

Ms. Verbeck alleges that she was entitled to a special request COER on a second ground because her separation constituted a "nonroutine action" within the meaning of eCCIS CC25.1, Instruction 1, Section G(4)(a). Pl.'s Resp. at 8–9. The government contends that Ms. Verbeck has waived a challenge based upon the "nonroutine action" portion of the special request COER provision because she did not expressly identify that particular segment of the COER provisions in the proceedings before the Board on remand. Def.'s Reply at 8 (citing *Metz v. United States,* 466 F.3d 991, 999 (Fed.Cir.2006); *Murakami,* 398 F.3d at 1354). The government argues also that probationary termination does not qualify as a "nonroutine action" because it is "governed by regulation[s] and policy guidelines that do not require special justification." Def.'s Reply at 9.

The government's waiver argument is unavailing. The primacy of COERs and the lack of notice to, and formal review of, Ms. Verbeck regarding her allegedly deficient performance formed the crux of Ms. Verbeck's improper termination claim, *see* AR2–R18, R20, R23 (Ms. Verbeck's Second Application to the Board), and was a central component of this court's prior opinion. *See Verbeck,* 89 Fed.Cl. at 64–66. Unlike claimants who raise divergent issues that are not strictly tethered to the regulations an administrative

review board is considering and charged with enforcing,[18] Ms. Verbeck's COER claim lies squarely within the ambit of the issues that were remanded to the Board and the regulations applicable to those issues. *See, e.g., Calloway v. Brownlee,* 366 F.Supp.2d 43, 54–55 (D.D.C.2005) (remanding to the agency even though "it was not explicitly clear that the plaintiff was challenging his [Noncommissioned Officer Evaluation Reports] in the manner they [were being challenged before the district court]" because evidence suggested he had challenged the issue generally).

"Nonroutine action" is not defined by the relevant instruction; however, under the interpretive canon of *ejusdem generis,* "when a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows." *Hall St. Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 586, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008); *see also Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 114–15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). Among the actions listed in eCCIS CC25.1, Instruction 1, Section G(4)(a), although requests for assimilation and involuntary retirement arise only after an officer's probationary period, *see* AR2–R49 (eCCIS CC23.7, Instruction 1, Section D(3)); three-year file reviews commence during an officer's probationary period, *see* AR2–R51 (eCCIS CC23.7, Instruction 1, Section E(5)), and assimilation can be the product of those reviews. *See* AR2–R100 (eCCIS CC23.7, Instruction 1, Section D(3)). Furthermore, the special-request COER provision and the relevant Instruction pertain to actions affecting both probationary as well as non-probationary officers. These circumstances indicate that termination during an officer's third year of probation constitutes "nonroutine action."[19] PHS' failure to pro-

---

**18.** *See, e.g., Metz,* 466 F.3d at 999 (plaintiff could not claim involuntary separation due to ineffective assistance of counsel in first instance before this court); *Murakami,* 398 F.3d at 1354 (plaintiff could not raise a claim in this court that had not been raised before the administrative agency).

**19.** The government also argues that even if this provision was violated it was harmless error because it "merely prevented Ms. Verbeck from

having an adverse special request COER in her official record." Def.'s Reply at 8. Given Ms. Verbeck's excellent past COERs, which, according to the government, were generated as she was having significant behavioral problems, the court cannot conclude what a special request COER would have reported. Furthermore, the PHS Manual dictates that the DCP "will follow up immediately on officers who have low COER ratings" and "[i]n all instances, the officer's immediate supervisor must discuss the evaluation

vide a timely COER contravened eCCIS CC25.1, Instruction 1, Section G(4)(a).

### 4. *Synopsis.*

This court had remanded Ms. Verbeck's claims to the Board such that it might address the manifest discrepancies between the COERs and awards Ms. Verbeck had received and the notes and commentary that immediately preceded her termination for cause by the PHS. *See Verbeck*, 89 Fed.Cl. at 69, 70. In its decision on remand, however, the Board failed to carry out its responsibilities to address the competing evidence of record and the all-too-evident lack of compliance by Ms. Verbeck's supervisory officers with PHS' regulations governing COERs. The court cannot conclude from the record that these omissions and errors are trivial. *See Frizelle*, 111 F.3d at 178. Accordingly, this case must again be remanded to the Board. In making and explaining this decision, the court has endeavored to cite the evidence that is contradictory and to identify the PHS regulations that have been contravened, without specifying any particular outcome respecting Ms. Verbeck's claims. On remand, the Board should put aside the approach taken during its prior two decisions and should undertake a fresh, complete analysis and reach a reasoned, objective decision in light of the whole record. The Board is reminded that "[t]he integrity and objectivity of the rating system [here, for commissioned officers,] go to the very heart of the military establishment's effectiveness, and all [the court] do[es] here is to preserve it as the statutes and authorized procedures contemplate and mandate." *Skinner*, 594 F.2d at 830.

## II. SEPARATION BASED ON DISABILITY

As her second claim, Ms. Verbeck contends that "she should have been referred to a MRB for disability evaluation[,]" Pl.'s Mot. at 17, and that the Board failed to consider evidence relating to Ms. Verbeck's medical impairment that arose during the last months of her service with the PHS. Pl.'s Resp. at 15–17; Hr'g Tr. 6:22–25. As support for this assertion, Ms. Verbeck relies upon her record of cancer, surgeries, and ensuing depression and upon a request by her attorney at the time, David P. Sheldon, that she be considered for a medical discharge. *See* Pl.'s Mot. at 14–19; Pl.'s Resp. at 15–16. The government avers that the Board properly determined that the regulatory mechanisms for referral to a MRB were not triggered prior to her separation. Def.'s Cross–Mot. at 26–27; Def.'s Reply at 18–19.

The PHS Manual provides that "[a]n officer may request, in writing, a fitness evaluation when he/she feels unable to perform the duties of his/her office and grade because of medical reasons." *See* AR2–R57 (eCCIS CC23.8, Instruction 6, Section F(1)).[20] "Upon receipt of a request for a fitness evaluation from the officer, the officer's program official, or, at the initiative of the Director, [Commissioned Personnel Operations Division ("CPOD")], the Chief, Medical Branch, CPOD, *will arrange for a complete medical examination* of the officer at an appropriate medical facility." AR2–R59 (eCCIS CC23.8, Instruction 6, Section I(1)) (emphasis added). The results of that medical examination, along with other pertinent materials, are then referred to the MRB, which makes the ultimate fitness-for-duty determination. *See* AR2–R59 (eCCIS CC23.8, Instruction 6, Sections I(2)-(3) and Section J(1)). The regulations governing "[r]equirements for [d]isability [r]etirement or [s]eparation with [b]enefits" specify that "[t]o be eligible for disability retirement or separation, an officer must be found unfit to perform the duties of his/her grade, category, or office because of one or more physical or mental conditions." AR2–R56 (eCCIS CC23.8, Instruction 6,

---

with the officer." AR2–R35 (eCCIS CC25.1, Instruction 1, Section C(3)). The court will likewise not presume what a DCP follow-up or a discussion with Ms. Verbeck's supervisor would have yielded.

**20.** The other two mechanisms for directing an officer to a fitness-for-duty evaluation and MRB

may be inapplicable here, as they appear to provide for discretionary referrals by an officer's program or the Director of DCP. AR2–R57 to R58 (eCCIS CC23.8, Instruction 6, Section F(2)-(3)). The court makes no determinations in this regard.

Section E(*l*)). "The PHS MRB ... is responsible for making formal recommendations to [the Assistant Secretary of Health] regarding an officer's fitness for duty and the rating of disabilities." AR2–R59 (eCCIS CC23.8, Instruction 6, Section J(*l*)). Thus, under PHS' regulations, a service member may not be granted a disability separation without a finding that the service member is unfit for duty—a determination which is made by a MRB. When an officer requests consideration for a medical discharge, logically inherent within that appeal is an invocation of the procedural prerequisites required for that discharge.[21]

Just prior to her separation, on May 30, 2002, Ms. Verbeck's counsel, David P. Sheldon, sent a letter to Rear Admiral Davidson, Director, DCP, requesting that he rescind Ms. Verbeck's termination letter or "delay her termination until she can complete medical care that she very much needs or allow her to be considered for a medical discharge." AR–261 (Letter from Sheldon to Rear Admiral Davidson). The letter explained that Ms. Verbeck's ongoing care resulting from her mastectomy, reconstructive surgery, and depression, and her upcoming surgeries to address serious uterine abnormalities rendered Ms. Verbeck "unfit to be discharged" and eligible "for a medical discharge." *Id.*

The government argues that "the Board rejected the notion that the letter from Ms. Verbeck's attorney ... constituted a request for an MRB" because her attorney "neither expressly requested an MRB, nor provided that Ms. Verbeck was 'unable to perform the duties of [ ]her office and grade because of medical reasons.' " Def.'s Cross–Mot. at 27. The Board's opinion, however, does not reflect any of the government's present arguments; rather, the solitary sentence in the Board's decision addressing this issue simply reads, "[s]he did not initiate a request." AR2–R4 (Correction Board's Second Decision).[22] The court cannot construe the Board's six-word statement on this issue to encompass the numerous arguments the government now presents as to why Ms. Verbeck's counsel's letter did not constitute a valid request for a fitness-for-duty evaluation. *See Epstein v. Geren,* 539 F.Supp.2d 267, 274 (D.D.C.2008) (While an agency can provide a "brief statement" justifying its decision, such a statement must explain "why it chose to do what it did." (quoting *Tourus Records, Inc. v. Drug Enforcement Admin.,* 259 F.3d 731, 737 (D.C.Cir.2001))). More importantly, the formalistic rigidity of the government's position does not withstand scrutiny. Ms. Verbeck's request that she be "considered for a medical discharge[,]" coupled with her claim that she was "unfit to be discharged[,]" was precisely a request that

21. The government argues that not all fitness-for-duty evaluations need be considered by a MRB, Def.'s Cross–Mot. at 28–29; however, the regulations expressly state that "the final decision regarding duty status will be made by PHS MRB." AR2–R124 (Pamphlet No. 47: Disability Evaluation Manual for the PHS' Commissioned Corps, Chapter 4, Section D); *see also* AR2–R104 (eCCIS CC49.3, Instruction 1, Section D(*l*)) ("The Surgeon General (SG) shall appoint [MRBs] as necessary to review the case of any officer who may be entitled to retirement due to physical disability.").

22. In support of its claim that Ms. Verbeck's letter did not constitute a request for a fitness-for-duty evaluation, the government cites to a memorandum prepared in 2009, seven years after the events at issue, from the Senior Medical Evaluations Officer, Medical Affairs Branch, to the Acting Director of the Surgeon General. *See* AR2–R323 to 325 (Mem. from Dr. Bernard W. Parker, Captain, US PHS to Acting Director, Surgeon General (Dec. 2, 2009)). That memo-

randum concluded that Ms. Verbeck's counsel requested "an extension in the officer's time on active duty to complete her medical care, but there is no indication that a request for a [fitness-for-duty] evaluation was made." AR2–R325. *This conclusion is manifestly erroneous.* Captain Parker likewise concluded that there were "no medical records" in Ms. Verbeck's file to support the contention that she was unfit to be discharged, *id.,* and that conclusion likewise is belied by the record.

Even if the Board relied on this memorandum for its conclusion—an entirely unsupported proposition—it accepted without scrutiny the determinations of the Senior Medical Evaluations Officer. While Ms. Verbeck's counsel indeed requested an extension of time for Ms. Verbeck to complete her medical care, he also requested that Rear Admiral Davidson "allow her to be considered for a medical discharge." AR–261 (Letter from Sheldon to Rear Admiral Davidson). The memorandum's failure to address that portion of Ms. Verbeck's request does not excuse the Board's failure to do so.

she be granted a fitness-for-duty evaluation and consideration by a MRB because she believed herself to be unable to perform the duties of her office due to a medical condition. Ms. Verbeck never received the "complete medical examination[,]" including a physical evaluation, contemplated by Section I(1) of eCCIS CC23.8, Instruction 6, and the parties agree that her case was never forwarded to a MRB for a fitness-for-duty determination. Hr'g Tr. 8:20–21, 56:14–24.

The government maintains, however, that even if Mr. Sheldon's letter constituted a request for a MRB, that letter alone was insufficient to serve as a basis for initiating a fitness evaluation because the Manual provides that "[w]hen an officer is being processed for separation or retirement for reasons other than physical disability[,] . . . [t]he officer shall not be referred for disability evaluation unless his/her physical condition raises substantial doubt that he/she is fit to continue to perform the duties of his/her office and grade." Def.'s Cross–Mot. at 27 (quoting AR2–R58 to R59 (eCCIS CC23.8, Instruction 6, Section H(b))). The government asserts that "[a]t the time of her separation, Ms. Verbeck's physical condition did not require referral to a MRB" because Ms. Verbeck was found "psychiatrically fit for duty" and there was "no indication that she was physically affected." Def.'s Cross–Mot. at 25.

Because the Board failed to address the fact that the letter from Ms. Verbeck's counsel constituted a request for a fitness-for-duty evaluation, it likewise did not address whether Ms. Verbeck's physical condition raised substantial doubt as to her fitness to continue performing her duties. The lack of consideration given to this question is only exacerbated by the fact that the evaluations contained within the administrative record and relied upon by the government address solely Ms. Verbeck's psychiatric condition—not her physical condition.[23] While Dr. Frenchen and Captain Nash evaluated Ms. Verbeck for her mental health and concluded that she was psychiatrically fit for duty, AR–249 (Letter from Dr. Frenchen to Dr. Hooper (Feb. 27, 2002)); AR–190 to 191 (Letter from Captain Nash to Commander Atwood (Mar. 7, 2002)), those determinations as to Ms. Verbeck's psychiatric condition are inapposite to her *physical* condition and do not constitute a "complete medical examination." Of particular relevance in this regard are Ms. Verbeck's numerous physical ailments at the time of her separation, including ongoing care related to her breast cancer, mastectomy and reconstructive surgery, and serious abnormalities presented in her uterus that required immediate surgeries. *See* AR–261 (Letter Sheldon to Rear Admiral Davidson).[24]

Acknowledging, as it must, that Ms. Verbeck "had a physical condition," the government asserts that "this condition did not necessarily make her unfit for duty in such a way as to require MRB referral." Def.'s Cross–Mot. at 26. However, the Board's opinion reveals the absence of any contemplation of this issue. "The court cannot review the procedural regularity or evidentiary sufficiency of an opinion that does not opine on dispositive legal questions." *Epstein,* 539 F.Supp.2d at 270. In light of the considerable evidence that Ms. Verbeck was suffering from a variety of serious, potentially incapacitating physical ailments at the time of her request for a medical discharge, the Board was arbitrary and capricious in ignoring this issue.

**23.** In the context of addressing whether Ms. Verbeck's condition required that the Director of the DCP by his own initiative refer Ms. Verbeck to a MRB, the Board declared that "[t]he record makes it very clear that Ms. Verbeck was capable of satisfactory or better performance of her duties." AR2–R4 (Correction Board's Second Decision). The Board, however, did not specify whether it was making such a determination as to Ms. Verbeck's psychiatric capacity to perform her duties or whether that conclusion took into account Ms. Verbeck's physical condition. The latter conclusion would have been difficult to reach given that Ms. Verbeck never received a contemporaneous physical evaluation, complete or otherwise.

**24.** At the time of Dr. Nash's evaluation, Ms. Verbeck was suffering from "a number of significant complications" due to her mastectomy, "including wound infections which ha[d] yet to resolve." AR–189 (Letter from Captain Nash to Commander Atwood (Mar. 7, 2002)).

**460**

Even the narrow judicial review this court exercises over the Board's decisions compels the court to vacate a decision that "fail[s] to address a potentially meritorious argument raised by [a] plaintiff." *Roberts v. Harvey*, 441 F.Supp.2d. 111, 121 (D.D.C. 2006). Because the Board did not address Ms. Verbeck's non-frivolous arguments on the issue of a fitness-for-duty evaluation by a MRB, the court must conclude that the Board's decision was arbitrary and capricious. *See, e.g., Frizelle*, 111 F.3d at 177 (An administrative board's decision is arbitrary if the board does not respond to a plaintiff's facially non-frivolous arguments, where those arguments "could affect the Board's ultimate disposition."); *Roberts*, 441 F.Supp.2d. at 119, 121–22 (A court "simply cannot determine whether" an administrative decision "was a proper exercise of its discretion [where] it failed to grapple with what appears to be a substantial issue.").[25]

### CONCLUSION

For the reasons stated, plaintiff's motion for judgment on the administrative record is GRANTED IN PART and DENIED IN PART.[26] Defendant's cross-motion is DENIED. The denial of relief to Ms. Verbeck by the Board for Correction of PHS' Commissioned Corps Records is VACATED, and the case shall again be remanded to the Board for six months. *See* RCFC 52.2(a). During that time proceedings in this court shall be stayed. *See* RCFC 52.2(b)(1)(C). The Board shall consider carefully and thoughtfully two separate issues. First, the Board shall address the contradictory evidence regarding Ms. Verbeck's service reflected in her exemplary COERs and awards, judged along with the criticisms set out in notes and memoranda particularly relating to

her last months of service. In this connection, the Board shall also take into account the failure of Ms. Verbeck's supervisory officers to prepare COERs and undertake a three-year performance review as required by PHS' regulations. Second, the Board shall also consider Ms. Verbeck's physical condition at the time of her separation, even though determination of her physical condition at that time might be very difficult to ascertain because the available medical records address that matter only circumstantially. On this record, there appears to be "substantial doubt" that she was "fit to continue to perform the duties of [ ]her office and grade[,]" AR2–R58 to R59 (eCCIS CC23.8, Instruction 6, Section H(b)), but the Board must focus on then-available medical evidence in light of the fact that no MRB was convened on a contemporaneous basis.

Defendant shall file a report on the status of the proceedings on remand within 90 days after the issuance of this opinion and order, and within each succeeding 90–day period thereafter.

It is so ORDERED.

**25.** Even if the government's current arguments as to these matters provided sufficient merit to substantiate the Board's conclusions—which they do not—such explanations have been submitted "for the first time in response to [Ms. Verbeck's] petition for judicial review[,]" and thus constitute "improper *post hoc* justification[s]." *Poole v. Harvey*, 571 F.Supp.2d 120, 126 (D.D.C.2008); *see id.* ("It is a 'fundamental rule of administrative law' that a court reviewing an agency's decision 'must judge the propriety of [agency] action solely on the grounds invoked by the agency.' " (quoting *SEC v. Chenery Corp.*, 332

U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947))).

**26.** Ms. Verbeck's request that the court remand her case to the Board with instructions that the Board allow her to supplement the record with work schedules and to depose Lieutenant (Junior Grade) Abaya and Commander Sowinski is not adopted. The Board lacks the power to order depositions, and Ms. Verbeck may submit supplementary materials to the Board on remand, in accord with the Board's procedural rules.