# United States Court of Appeals for the Federal Circuit

_____

**JAMES ANTONELLIS,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

_____

2012-5140

_____

Appeal from the United States Court of Federal Claims in No. 11-CV-666, Judge Edward J. Damich.

_____

Decided: July 18, 2013

_____

JEFFREY A. VOGELMAN, Thomas, Ballenger, Vogelman & Turner, P.C., of Alexandria, Virginia, argued for plaintiff-appellant.

LAUREN S. MOORE, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were STUART F. DELERY, Principal Deputy Assistant Attorney General, JEANNE E. DAVIDSON, Director, and DONALD E. KINNER, Assistant Director.

Before DYK, BRYSON, and REYNA, *Circuit Judges.*

DYK, *Circuit Judge.*

James Antonellis, an officer in the United States Navy Reserve, appeals from a decision of the United States Court of Federal Claims ("Claims Court") dismissing his back pay claim for failure to state a claim upon which relief can be granted. *See Antonellis v. United States*, 106 Fed. Cl. 112 (2012). Antonellis alleged that he was entitled to back pay under the Military Pay Act, 37 U.S.C. § 206(a), because the Navy acted improperly in failing to assign him to a pay billet. The Claims Court dismissed Antonellis' claim as nonjusticiable, reasoning that there were no standards by which it could review the Navy's assignment decisions. We affirm.

## BACKGROUND

Antonellis has been a member of the Navy Reserve since 1986. There is no dispute that he "has had a respectable and upstanding career with the Navy." *Antonellis*, 106 Fed. Cl. at 113. Antonellis is a member of the Ready Reserves, which includes the Selected Reserve and the Individual Ready Reserve. *Id.* The Selected Reserve is a paid unit; the Individual Ready Reserve is unpaid. *Id.* The Individual Ready Reserve includes Volunteer Training Units, in which members perform their reserve duties without pay. *See* Bureau of Naval Personnel Instruction 1001.39F, Ch. 3, § 301 (Sept. 17, 2007). Antonellis appears to contend that there is no relevant difference in the duties performed by paid and unpaid reserve members. *See* Compl. ¶ 7, *Antonellis v. United States*, 106 Fed. Cl. 112 (2012) (No. 11-cv-666), ECF No. 1 ("Compl."); Oral Arg. at 35:12–35:32, *Antonellis v. United States*, No. 2012-5140 (Fed. Cir. argued May 7, 2013) ("Oral Arg.").

The National Command and Senior Officer Non-Command Billet Screening and Assignment Board (the "APPLY Board") possesses delegated authority to appoint officers to Selected Reserve billets. *Antonellis*, 106 Fed. Cl. at 113–14. It assigns officers to billets pursuant to a policy guidance letter issued by the Commander of the Navy Reserve Forces Command ("Commander"). *Id.* The Commander's guidance letter directs the APPLY Board to convene panels to evaluate billet candidates based on specified criteria and to "select the best qualified Officer" for each billet. J.A. 30; *Antonellis*, 106 Fed. Cl. at 114.

The Commander's guidance letter also specifies the selection process. The APPLY Board member responsible for each application "prepare[s] and deliver[s] a briefing" regarding the application and recommends a numerical "confidence factor" to be "voted on by each [APPLY] Board member." J.A. 29–30. Confidence factors range from 0 to 100 percent, with a score of 0 percent indicating that the applicant is "[n]ot competitive with other Officers" and a score of 100 percent indicating that the applicant is an "[o]utstanding Officer" who "should be screened for assignment." J.A. 30.

The Commander's guidance letter also specifies the criteria to be used in evaluating each applicant. It lists "[p]roven and sustained superior performance in command or other leadership positions" and "successful performance and leadership in combat conditions" as important factors and states that the APPLY Board "shall give favorable consideration to those Officers who have displayed superior performance while serving in Individual Augmentee (IA) assignments in direct support of the Global War on Terrorism." J.A. 32–33. The letter further indicates that the APPLY Board "shall give favorable consideration to those Officers with[] relevant graduate education, experience in specialized areas, and professional military education." J.A. 33. The letter does not

specify, however, the weight to be given to each criterion in assigning the numerical confidence factor.

The confidence factor provides the basis upon which applicants are then ranked on a "precedence list." J.A. 30. "The precedence list . . . establish[es] the sequence in which [applicants are] considered for assignments." *Id.* The Board then conducts deliberations regarding each assignment. The Commander's guidance letter states that the APPLY Board's

> goal [is] to select the best qualified Officer to a billet that the majority of the Board members consider the best match for the preference and qualifications of the Officer, the mission of the unit, and the requirements of the Supported command and billet.

*Id.*

From 2009 through 2011, Antonellis submitted sixty-nine applications for Selected Reserve billets to the APPLY Board, but he was not assigned to any Selected Reserve billet. *Antonellis*, 106 Fed. Cl. at 113. During that period, Antonellis was instead assigned to a Volunteer Training Unit in the Individual Ready Reserve and he performed his reserve duties without pay. *Id.*

On October 12, 2011, Antonellis filed suit against the United States in the Claims Court. He attached the Commander's guidance letter to his complaint and asserted that, based on his outstanding service record and the standards described in the Commander's guidance letter, he "has been clearly entitled to a pay billet during the period of time he has . . . been turned down for such." Compl. ¶ 8. He further alleged that the APPLY Board's decision not to assign him to a Selected Reserve pay billet was "arbitrary, capricious, [and] unsupported by substantial evidence." *Id.* He sought over $64,700 in back pay. *Antonellis*, 106 Fed. Cl. at 114. The Claims Court found

Antonellis' claim nonjusticiable. *Id.* at 116. It assumed, without deciding, that the Commander's guidance letter was legally binding, but it found that the letter merely "calls for the Board to make a subjective determination of which officers are the 'best' qualified and the 'best match' for each billet," and thus failed to provide any justiciable standards for the court to apply. *Id.* at 116 & n.2. The Claims Court therefore dismissed Antonellis' complaint for failure to state a claim upon which relief can be granted. *Id.* at 116.

Antonellis timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3). We review de novo the Claims Court's dismissal for failure to state a claim upon which relief can be granted. *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

## DISCUSSION

### I

When applicable, the Tucker Act confers jurisdiction on the Claims Court and waives the United States' sovereign immunity. *See Greenlee Cnty., Ariz. v. United States*, 487 F.3d 871, 875 (Fed. Cir. 2007). However, "[t]he Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part). Here, Antonellis relies on the Military Pay Act as the pertinent money-mandating statute. Although the government appears to have challenged the Claims Court's Tucker Act jurisdiction below, *see Antonellis*, 106 Fed. Cl. at 114, it does not press that argument on appeal. We in any event must determine that we have jurisdiction. We have long recognized that the Military Pay Act "provides for suit in [the Claims Court] when the military, in violation of the Constitution, a statute, or a regulation, has

denied military pay." *Dysart v. United States*, 369 F.3d 1303, 1315 (Fed. Cir. 2004); *see also Sanders v. United States*, 594 F.2d 804, 810–11 (Ct. Cl. 1979) (en banc). The Claims Court therefore had jurisdiction.

## II

The government urges that we should affirm the Claims Court. It argues that even if Antonellis could establish a violation of the instructions set forth in the Commander's guidance letter (and that the letter was legally binding), the Claims Court cannot award him back pay. Alternatively, the government argues that the letter does not set forth judicially cognizable criteria. In order to understand the context of this controversy, some description of prior authority is useful.

Unfortunately, our decisions and those of our predecessor court, the United States Court of Claims, do not always present a clear picture of the remedies available to a service member challenging a decision concerning promotion, separation, or reassignment. Nonetheless, several principles can be distilled from those cases.

First, civilian courts are reluctant to second-guess decisions of the military authorities as to promotion, separation, or reassignment. We have emphasized that "the military is entitled to substantial deference in the governance of its affairs." *Dodson v. United States*, 988 F.2d 1199, 1204 (Fed. Cir. 1993); *see also Orloff v. Willoughby*, 345 U.S. 83, 93 (1953) ("[J]udges are not given the task of running the Army."). We have also noted that there are "thousands of . . . routine personnel decisions regularly made by the services which are variously held nonjusticiable or beyond the competence or the jurisdiction of courts to wrestle with." *Voge v. United States*, 844 F.2d 776, 780 (Fed. Cir. 1988). In particular, we have emphasized that "[a] court lacks the special expertise needed to review reserve officers' records and rank them on the basis of

relative merit." *Sargisson v. United States*, 913 F.2d 918, 922 (Fed. Cir. 1990).

Second, if a statute, regulation, or instruction specifies the particular procedure to be followed in personnel actions, and the plaintiff alleges that the required procedure was not followed, a judicial remedy may be available. When the military promulgates procedural regulations and instructions and makes them the basis for a personnel action, that action is "subject to judicial review for compliance with those regulations and instructions." *Sargisson*, 913 F.2d at 921. When a party asserts that the military violated a specific procedure mandated by statute or regulation, "the test[s] or standards against which this court measures the military's conduct are inherent: they are the applicable statutes and regulations." *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995) (citing *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993)). For example, in *Adkins*, we recognized that "although the *merits* of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular *procedure* followed in rendering a military decision may present a justiciable controversy." *Id.* at 1323. There, the plaintiff asserted that the Secretary of the Army had, inter alia, improperly considered evidence outside the administrative record in rejecting the Army Board for Correction of Military Records' recommendation to remove certain negative information (which had allegedly led to Adkins' involuntary retirement) from Adkins' personnel file. *Id.* at 1319–20, 1324. We held that this allegation was justiciable because it involved a procedural requirement that the Secretary "'base his decision on the record as the board presents it to him.'" *Id.* at 1325–26 (quoting *Selman v. United States*, 723 F.2d 877, 880 (Fed. Cir. 1983)).

Some cases have given a broad scope to judicial review of such procedural matters. In *Sanders*, the Court of Claims, sitting en banc, reversed a non-promotion deci-

sion of the Air Force because the Air Force did not comply with a statutory requirement "to consider him on the basis of a record which portrayed his service career on 'a fair and equitable basis.'" *See* 594 F.2d at 806–08, 814 (quoting 10 U.S.C. §§ 3442(c), 8442(c) (1976) (repealed 1980)). Similarly, in *Skinner v. United States*, the court considered a claim that that the plaintiff's non-selection for a promotion had been based on ratings which had been directed by superior officers and were therefore tainted by "improper command influence." 594 F.2d 824, 828 (Ct. Cl. 1979).

Third, contrary to the government's argument, a back pay remedy under the Military Pay Act is available under some circumstances, based on a finding of procedural violations.

To be sure, back pay is not always available. For example, in the promotions context we have noted that "the Military Pay Act ordinarily does not give rise to a right to the pay of the higher rank for which the plaintiff was not selected." *Smith v. Sec'y of the Army*, 384 F.3d 1288, 1294 (Fed. Cir. 2004). This is so because, generally, "a service member is entitled only to the salary of the rank to which he is appointed and in which he serve[d]." *Id.* However, we have also recognized circumstances in which back pay is available. One such exception arises when the plaintiff "has satisfied all the legal requirements for promotion, but the military has refused to recognize his status." *Id.* (citing *Skinner*, 594 F.2d at 830). Another exception arises when a decision not to select a plaintiff for promotion leads to his compulsory discharge. *See id.* at 1295. In such circumstances, a successful plaintiff may recover back pay because the Military Pay Act "'confers on an officer the right to pay of the rank he was appointed to up until he is properly separated from the service.'" *Id.* (quoting *Sanders*, 594 F.2d at 810); *see also Adkins*, 68 F.3d at 1327. As discussed below, still another exception exists where the back pay claim is based on action by a

Board for the Correction of Military Records, *see* 10 U.S.C. § 1552, at least where a special selection board has been convened pursuant to 10 U.S.C. § 628. *See generally Porter v. United States*, 163 F.3d 1304 (Fed. Cir. 1998). While we need not articulate precisely when back pay is or is not available here, our cases make clear that a personnel decision based on procedural error can lead to an award of back pay in some instances.

The government attempts to derive a contrary rule from *Palmer v. United States*, 168 F.3d 1310 (Fed. Cir. 1999) and our unpublished disposition in *King v. United States*, 53 F. App'x 930 (Fed. Cir. 2002) (nonprecedential). According to the government, in both *Palmer* and *King* we held that back pay is not an available remedy.

We find no such rule in those cases. *Palmer* simply held that a service member could not recover back pay for duties not performed, 168 F.3d at 1312–14, while in *King*, the Claims Court decision (affirmed by this court) held that the governing policy handbook was merely "aspirational" and did not carry the force of law, and that Air Force Regulation 36-20 "furnishes no judicially enforceable standards." *King v. United States*, 50 Fed. Cl. 701, 710 (2001).

Fourth, a complaint concerning procedural violations must typically be brought first before a Board for the Correction of Military Records. *See* 10 U.S.C. § 1552. Although there is generally no requirement that a plaintiff exhaust remedies with the applicable Corrections Board before filing suit in the Claims Court, *Heisig v. United States*, 719 F.2d 1153, 1155 (Fed. Cir. 1983), these cases normally still proceed through the Corrections Boards because "[t]ypically, if suit is filed just in the [Claims Court], that court will require resort to a Corrections Board while the matter remains pending in that court." *Richey v. United States*, 322 F.3d 1317, 1323 (Fed. Cir. 2003). In such cases, if the Corrections Board refuses

relief, the service member can seek review in Claims Court pursuant to the Military Pay Act, which is the money-mandating statute that provides the Claims Court with Tucker Act jurisdiction. *See, e.g., Adkins*, 68 F.3d at 1318, 1321. With respect to promotions disputes, Congress in 1980 enacted the Defense Officer Personnel Management Act ("DOPMA"), *see* Pub. L. No. 96-513, 94 Stat. 2835 (1980).[1] DOPMA provides that the Corrections Boards shall create "special selection boards" to reconsider individuals for a promotion in such cases, *see* 10 U.S.C. § 628; *see also Richey*, 322 F.3d at 1323–25; *Porter*, 163 F.3d at 1312–15. The special selection board considers the officer's record (with any necessary corrections) together with "a sampling of the records of those officers of the same competitive category" and makes a determination of whether the officer should be recommended for a promotion. 10 U.S.C. § 628(a), (b). The special selection board then submits a report to the Secretary of the pertinent military department detailing its recommendation. 10 U.S.C. § 628(c)(1). If the report recommends the officer for a promotion, and the report of the board is approved by the President, then the officer is promoted and becomes entitled to the pay and allowances that he would

---

[1]    Prior to the enactment of DOPMA, if a service member established a procedural defect in the promotions process, his right to recover could be defeated if the government established harmless error. *See Sanders*, 594 F.2d at 814–18; *Hary v. United States*, 618 F.2d 704, 709–10 (Ct. Cl. 1980). In *Porter*, we held that, where applicable, the procedures provided by § 628 superseded that harmless error approach. 163 F.3d at 1321–24. However, we were also careful to emphasize that we did not overrule *Sanders* in its entirety, *see id.* at 1323, and our subsequent cases suggest that harmless error remains an appropriate inquiry in other contexts. *See Christian v. United States*, 337 F.3d 1338, 1347–48 (Fed. Cir. 2003).

have received but for the original, defective promotion board decision. 10 U.S.C. § 628(d); *Richey*, 322 F.3d at 1328. When the officer is promoted, he becomes entitled to a back pay remedy. *See Porter*, 163 F.3d at 1315.

Finally, a remedy is available only if the statute, regulation, or instruction provides justiciable standards. This is because a controversy is justiciable only if there are "tests or standards for the court to apply." *Voge*, 844 F.2d at 780; *see also Baker v. Carr*, 369 U.S. 186, 217 (1962) (noting that an issue is nonjusticiable if there is "a lack of judicially discoverable and manageable standards for resolving it"); *Coleman v. Miller*, 307 U.S. 433, 452–53 (1939) (finding no "criteria for . . . a judicial determination" of what constitutes a "reasonable time" in which to ratify an amendment to the U.S. Constitution). Thus, in *Gilligan v. Morgan*, the Supreme Court held nonjusticiable a challenge to the "training, weaponry[,] and orders of the Ohio National Guard" because of "a lack of judicially discoverable and manageable standards." 413 U.S. 1, 5–6, 8 (1973) (quotation marks omitted). The Court further emphasized that "it is difficult to conceive of an area of governmental activity in which the courts have less competence" than "decisions as to the composition, training, equipping, and control of a military force." *Id.* at 10.

Thus, even where a procedural violation is alleged, the matter is nonjusticiable unless the pertinent regulations or instructions provide sufficient "tests or standards" against which the court can measure the military's conduct. *See Sargisson*, 913 F.2d at 921–22; *see also King*, 50 Fed. Cl. at 710 (finding the plaintiff's reliance on Air Force Regulation ("AFR") 36-20 "unavailing" because the regulation "furnishe[d] no judicially enforceable standards"). For example, in *Sargisson*, an Air Force reserve officer alleged that the Air Force improperly released him from active duty pursuant to AFR 36-12 ¶ 71 and an implementing Letter of Instructions issued by the Secretary of the Air Force. 913 F.2d at 920–21. However,

we found that "the Secretary's compliance with AFR 36-12 ¶ 71 and the Letter of Instructions [wa]s . . . nonjusticiable," reasoning that "[n]either AFR 36-12 ¶ 71 nor the Letter of Instructions gave any 'tests or standards' by which the Claims Court could determine whether the decision to release Sargisson from active duty was correct." *Id.* at 921–22.

## III

The government contends that, even if there were a procedural defect in the Navy's billet assignments, "[Antonellis] might be entitled to judicial review of whether procedures were followed, but he still cannot receive . . . money for a position [to which] he was not assigned." Oral Arg. at 18:13–18:41. As discussed above, based on our past decisions and those of our predecessor court, we cannot agree with the government that Antonellis' claim fails because monetary relief is categorically unavailable to redress a procedural violation resulting in the failure to assign him to a pay billet. At the same time, we agree with the Claims Court that Antonellis failed to allege a justiciable controversy as required by our authority.

Antonellis attempts to frame his claim as a challenge to the APPLY Board's compliance with required procedures. Thus, he argues that the Commander's guidance letter includes "pages of supporting procedure" which "specifically set forth the factors which are to be considered by [the APPLY Board,] . . . prohibit from discussion or disclosure certain other factors[, and] . . . require the Board members to assign applicants a numerical ranking based on the assigned confidence factor derived from the available enumerated criteria." Appellant's Br. 12–13. A closer examination of Antonellis' argument, however, reveals that he is not in substance alleging a procedural violation. In his complaint, Antonellis asserts, inter alia, that the APPLY Board's failure to assign him to a Selected Reserve billet is "biased, unexplained," Compl. ¶ 7,

"arbitrary, capricious, unsupported by substantial evidence," "a flagrant abuse of discretion, [and] in bad faith," *id.* ¶ 10. Antonellis argues in his brief that "it is reasonable to infer that given [his] qualifications and exemplary record, the that APPLY Board failed to follow the procedures and criteria set forth in the [Commander's guidance letter]." Appellant's Br. 13. Apart from this proposed inference, however, Antonellis asserts no basis for concluding that the Navy's assignment process was procedurally defective. Indeed, at oral argument, counsel for Antonellis conceded that he lacked an adequate basis to even allege any specific procedural violation. Oral Arg. at 6:22–7:05.[2]

Even if Antonellis' complaint could be read as alleging a procedural violation, as the Claims Court observed, the Commander's guidance letter "lists the factors the Board should consider [in making billet assignments], but it

---

[2] At oral argument, Antonellis' counsel suggested that the APPLY Board did not score and rank Antonellis as required by the Commander's guidance letter. Oral Arg. at 6:02–6:16. However, he stated that he had not included that allegation in Antonellis' complaint because he lacked a sufficient basis to make it:

Q: "Well where does it—I don't see where paragraph ten or any other thing you've called to our attention says he wasn't ranked or scored."

A: "Because I can't, until I can see what their evidence—"

Q: "You don't even allege it."

A: "Well . . . perhaps I should have. It's hard to do that because you're supposed to have a basis for making an allegation."

*Id.* at 6:30–6:53.

does not specify the weight to be given to each factor." *Antonellis*, 106 Fed. Cl. at 116. While the Commander's guidance letter specifies in considerable detail the procedures to be followed, it ultimately directs Board members to

> select the best qualified Officer to a billet that the majority of the Board members consider the best match for the preference and qualifications of the Officer, the mission of the unit, and the requirements of the Supported command and billet.

J.A. 30. Courts are in no position to determine the "best qualified Officer" or the "best match" for a particular billet. *See Sargisson*, 913 F.2d at 922. We therefore affirm the Claims Court's dismissal of Antonellis' complaint.

## AFFIRMED

### COSTS

No costs.