# In the United States Court of Federal Claims

No. 08-357C

(Filed: July 23, 2013)

| | | |
|---|---|---|
| **MARY E. VERBECK,** | ) | Wrongful termination claim by former |
| | ) | Lieutenant Commander in the Public |
| **Plaintiff,** | ) | Health Service Commissioned Corps; |
| | ) | application of Commissioned Corps |
| **v.** | ) | Personnel Manual 23.7-I1 §§ D, E |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

Steven Harold Haney, Haney Law Group, Los Angeles, CA, for plaintiff.

Steven M. Mager, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Stuart F. Delery, Acting Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Lisa M. Flynn McGinnis, Assistant Regional Counsel, Office of General Counsel, Region X, United States Department of Health and Human Services.

## OPINION AND ORDER

LETTOW, Judge.

Plaintiff, Mary Verbeck, a former Lieutenant Commander in the Public Health Service ("PHS") Commissioned Corps, brought this wrongful-termination suit over five years ago. After two prior remands by the court to the Board for Correction of PHS Commissioned Corps Records (the "PHS Correction Board" or "the Board"),[1] the case is again before the court after the Board rejected Ms. Verbeck's claim for relief for a third time.

After Ms. Verbeck submitted a motion for judgment on the administrative record of the PHS Correction Board's proceeding, *see* Pl.'s Mot. for Judgment on the Admin. Record (Pl.'s Mot."), ECF No. 106, the government responded by filing a motion for a third remand, *see* Def.'s Mot. for Voluntary Remand to the Board for Correction of Commissioned Corps Records,

---

[1]*See Verbeck v. United States*, 97 Fed. Cl. 443 (2011) ("*Verbeck II*"); *Verbeck v. United States*, 89 Fed. Cl. 47 (2009) ("*Verbeck I*").

ECF No. 109.[2]  The court denied that motion, *see* Order of April 3, 2013, ECF No. 112, and the government then filed a cross-motion for judgment on the administrative record and a motion to correct the administrative record, *see* Def.'s Cross-Mot. for Judgment on the Admin. Record and Resp. to Pl.'s Mot. for Judgment on the Admin. Record, ECF No. 118 ("Def.'s Cross-Mot."); Def.'s Mot. to Correct the Admin. Record, ECF No. 117.  Earlier, the court granted the government's motion to correct the administrative record.  *See* Order of July 19, 2013, ECF No. 125.  The pending cross-motions have been fully briefed, and a hearing was held on June 13, 2013.

## FACTS[3]

Ms. Verbeck began her service as a nurse practitioner with the PHS Commissioned Corps in November 1999.  *Verbeck II*, 97 Fed. Cl. at 446.  She had previously served honorably and commendably as an officer in the United States Navy, and in effect transferred to the PHS Commissioned Corps.  *See Verbeck I*, 89 Fed. Cl. at 51.  Despite her prior Navy service, Ms. Verbeck began her tenure at the PHS with a probationary period of three years.  *Verbeck II*, 97 Fed. Cl. at 455.  Her first PHS posting was at an Immigration and Naturalization Service ("INS") facility located in Queens, New York.  *Id.* at 446.  In October of 2000, she requested and

---

[2]In the motion for remand, the government noted that the PHS Correction Board had not responded fully to the court's second remand:

> The United States seeks this remand in order to clarify the record in response to a number of concerns raised in Ms. Verbeck's motion for judgment upon the administrative record, and to permit the board to take appropriate action in either granting or denying Ms. Verbeck's claims. . . .
>
> [The] board does not appear to have analyzed the impact of the failure of Ms. Verbeck's supervisory officers to prepare a final COER or undertake a three-year performance review, as purportedly required by the agency's regulations. . . . Although the [c]ourt should defer to the agency's reasonable interpretation of its own regulations and we agree with the board's legal analysis, it is unclear from the record how the board would respond in the event that its interpretation of the law is incorrect.  Accordingly, on remand the board should clarify the record to determine what effect, if any, the failure of Ms. Verbeck's supervisory officers to prepare a final COER or undertake a three-year performance review would have upon her termination.

Def.'s Mot. for Voluntary Remand at 1-2.

[3]The recitation of facts is drawn from the administrative record.  *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005) ("[T]he [c]ourt . . . is required to make factual findings under [what is now Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC")] from the record evidence as if it were conducting a trial on the record.").

2

was granted a transfer from that facility and was assigned to the INS center in San Pedro, California. *Id.* At both INS facilities, Ms. Verbeck's performance was reviewed on an annual basis, which reviews were memorialized in Commissioned Officer Effectiveness Reports ("COERs") prepared by her superior officers and reviewed with and provided to her. During 2000 and 2001, her COERs reflected an overwhelmingly positive view of Ms. Verbeck's work, stating that she was "prompt and professional," that she innovated new methods of "maximiz[ing] productivity of the clinic staff," and that her "team approach" helped create a "positive work environment." AR3-S36 to S49 (Verbeck COERs); *see also* AR2-R5 (PHS Correction Board Decision upon Remand (Apr. 16, 2010)) (noting that Ms. Verbeck "had numerous awards and excellent officer efficiency ratings through 2001").[4]

In the fall of 2001, Ms. Verbeck was diagnosed with breast cancer, and pursued treatment. She underwent two major surgeries, the first a radical mastectomy and the second a response to complications from a staphylococcal infection that followed the original surgery. *See Verbeck II*, 97 Fed. Cl. at 447. Concurrent with her illness and subsequent complications, Ms. Verbeck began to experience major depression, which was diagnosed by her treating physician. *Id.*[5] This depression persisted through Ms. Verbeck's return to work in early 2002, and Ms. Verbeck's superiors were given notice of the condition at that time. *See id.* Ms. Verbeck's depression was further exacerbated by two incidents at work during which she felt her safety was threatened by INS facility detainees. *Id.* Around this same time, Ms. Verbeck notified her superiors of several potential OSHA violations which she had observed at the facility. *Id.*

On February 14, 2002, following several instances in which she failed to report to work, Ms. Verbeck was placed on paid leave pending the production of medical documentation that she was fit to perform full duty. *Verbeck II*, 97 Fed. Cl. at 447. Ms. Verbeck provided documentation from her own treating physician the very next day, on February 15, 2002, which stated that in spite of her major depression, she was capable of returning to full duty. *Id.* The next day she filed a complaint with the Office of Equal Opportunity and Civil Rights alleging discrimination on the basis of perceived physical or mental disability, and two days later, she sent a letter to OSHA listing potential health and safety violations at the San Pedro INS facility. *Id.* On February 19, 2002, Ms. Verbeck returned to work, but her restored tenure was short-lived. That same day, Ms. Verbeck's superiors conferred with each other and concluded that her presence at the facility was "detrimental to . . . functioning, productivity, and staff morale." *Id.* These concerns were not documented in any COER nor in any other writing provided to

---

[4]In the original round of proceedings, an administrative record was filed in accordance with RCFC 52.1(a). "AR-__" refers to the administrative record first filed with the court. A second administrative record was filed on June 4, 2010, respecting the Board proceedings after the first remand. References to the administrative record of the first remand proceedings are to "AR2-R__." A third administrative record was filed on July 23, 2012, following the Board proceedings on the second remand. References to the administrative record of the second remand proceedings are to "AR3-S__."

[5]After surgery, Ms. Verbeck had returned to duty on November 6, 2001, and was performing care for her own open wound at regular intervals each day. *See* AR3-S791.

Ms. Verbeck. The record does not reflect whether Ms. Verbeck's superiors orally conveyed their assessment to her during that time. On February 20, 2002, Ms. Verbeck was again placed on nonduty-with-pay status, pending a second opinion from the Medical Affairs Branch regarding her fitness for duty. *Id.*

In late February and early March, Ms. Verbeck was examined by two physicians, both of whom determined that she was psychiatrically fit for full duty, although Captain William Nash, a Navy doctor, did recommend that consideration be given to transferring Ms. Verbeck to "a less stressful work environment." *Verbeck II*, 97 Fed. Cl. at 448 (citing AR-190 to 191 (Letter from Captain Nash to Commander Atwood (Mar. 7, 2002))). It appears from the record that such a transfer was neither seriously contemplated nor actually consummated.

On March 21, 2002, Ms. Verbeck was informed that an administrative investigation was underway, and that pending its resolution she would continue in her current nonduty-with-pay status. *Verbeck II*, 97 Fed. Cl. at 448. On April 4, 2002, Dr. Eugene Migliaccio, Director of the Division of Immigration Health Services, requested Ms. Verbeck's immediate separation from service due to her "unsuitability" for the position. *Id.* (citing AR-338 (Mem. from Dr. Migliaccio to Rear Admiral R. Michael Davidson, Director, Division of Commissioned Personnel ("DCP"))). At no point during this administrative investigation does it appear that any COER or equivalent written or oral review of Ms. Verbeck's performance was generated or provided to her. On May 1, 2002, Ms. Verbeck was notified that her commission was terminated, effective June 1, 2002. *Id.* Although Ms. Verbeck requested that the termination be postponed until she could receive medical care or that she be afforded consideration for a medical discharge, her request was denied. *Id.* Ms. Verbeck was separated from the service on June 1, 2002. *Id.* (citing AR-266 (Letter from Rear Admiral Davidson to David P. Sheldon, Attorney to Ms. Verbeck (June 17, 2002))).

After pursuing administrative remedies unsuccessfully, Ms. Verbeck filed suit in this court on May 19, 2008, alleging improper termination and retaliatory termination. In a decision issued on August 27, 2009, the court held that while it had jurisdiction over Ms. Verbeck's improper termination claim, her retaliatory termination claims grounded in the Americans With Disabilities Act, 42 U.S.C. §§ 12101-12213, and whistleblower protection statutes were beyond the court's jurisdiction and had to be dismissed. *See Verbeck I*, 89 Fed. Cl. at 61-62. Regarding the termination claim, the court further held that the Board had failed to give proper consideration to Ms. Verbeck's COERs and awards which Ms. Verbeck had received during her time at PHS and to evidence casting doubt on the veracity of informal documentation allegedly recording poor performance on the part of Ms. Verbeck. *Id.* at 65-66. The court remanded Ms. Verbeck's case to the Board for consideration of these factors, as well as for a consideration of evidence of significant physical impairment which might have qualified Ms. Verbeck for a disability separation. *Id.* at 70.

On remand, the Board denied Ms. Verbeck's claims, concluding that her medical issues did not warrant convening a Medical Review Board for evaluation and that her prior positive COERs were not sufficient to outweigh the "behavioral issues that had surfaced in Ms. Verbeck's first assignment." AR2-R5 (Correction Board Decision upon Remand (Apr. 16, 2010)). Hinging its decision on the supposition that Ms. Verbeck's "behavioral issues" which

4

arose after her surgery were somehow connected to those associated with her transfer from the Queens facility in 2000, which had not been formally documented, the Board found that the termination was appropriate. *Id.*

The court issued a second opinion on February 18, 2011, after Ms. Verbeck requested relief from the Board's decision on remand. *Verbeck II*, 97 Fed. Cl. 443. This opinion noted that the administrative record reflected only sparse evidence of Ms. Verbeck's alleged behavioral issues, and that much of that evidence appeared to have been generated several years after the events which were described. *Id.* at 453-54. Furthermore, Ms. Verbeck's COERs (which were generated immediately following each period of review) contradicted many of the assertions upon which the Board appeared to have relied to arrive at its conclusions. *Id.* A COER which could have been most relevant, that which should have been generated in early 2002 when Ms. Verbeck's alleged behavioral issues manifested, had never been created. Accordingly, the court again remanded Ms. Verbeck's case to the Board, noting that "the Board failed to carry out its responsibilities to address the competing evidence of record and the all-too-evident lack of compliance by Ms. Verbeck's supervisory officers with PHS'[s] regulations governing COERs." *Id.* at 457. The court also found that the Board had failed to address Ms. Verbeck's potentially meritorious disability claim by completely ignoring the fact that she had requested a fitness-for-duty evaluation prior to her termination. *Id.* at 459-60. Thus, the remand to the Board included a mandate to consider evidence of Ms. Verbeck's exemplary service as reflected in COERs and awards, the failure of her supervisory officers to prepare required COERs, and Ms. Verbeck's physical condition at the time of separation which might have qualified her for a disability designation. *Id.* at 460.

On December 9, 2011, the Board re-affirmed its earlier decisions, finding Ms. Verbeck's involuntary separation to have been properly executed. *See* AR3-S186 to S189 (Correction Board Decision upon Second Remand (Dec. 9, 2011)). The Board posited that this court had misinterpreted the controlling regulations respecting COERs during a probationary officer's third year. AR3-S187. In its decision the Board took no conclusive position as to Ms. Verbeck's medical claims, but determined to defer a final decision until a pending Medical Review Board ("MRB") proceeding had been completed. AR3-S188. Ms. Verbeck submitted to an examination by the MRB. On January 26, 2012, the Medical Appeals Board confirmed a recommended finding that "the officer was fit for full duty" at the time of her separation, and thus not eligible for medical separation. AR3-S198 (MRB Appeal Report). On March 15, 2012, the PHS Correction Board then issued an addendum to its decision, denying Ms. Verbeck's request for a disability designation. *See* AR3-S199 to S200 (Correction Board Follow-On Decision upon Second Remand (Mar. 15, 2012)).

On December 14, 2012, Ms. Verbeck contested the PHS Correction Board's decision on the second remand, filing a motion for judgment on the administrative record, arguing that the PHS's decision to terminate her employment was arbitrary and capricious, in opposition to her exemplary record, and in contravention of PHS procedures.

5

**STANDARDS FOR DECISION**

The parties' cross-motions for judgment upon the administrative record were filed pursuant to RCFC 52.1(c). As the Rules Committee notes regarding the adoption of RCFC 52.1 state: "The standards and criteria governing the court's review of agency decisions vary depending upon the specific law to be applied in particular cases. The rule does not address those standards or criteria." RCFC 52.1 Rules Committee note for 2006 adoption. In this instance, Ms. Verbeck must demonstrate through the administrative record that the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence. *See Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005).

The court must be satisfied that "the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it." *Verbeck II*, 97 Fed. Cl. at 451 (citing *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983)). The "substantial evidence" standard of review focuses on "a determination whether the *conclusion being reviewed* is supported by substantial evidence," rather than a "reweighing of the evidence." *Heisig*, 719 F.2d at 1157 (emphasis in original). Although the court has only a limited role in reviewing military decisions regarding suitability to serve, *see id.* at 1156, it may nevertheless overturn the Board's decision if it finds that there is not a "rational connection between the facts found and the choice made," *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 626 (1986). The court may not substitute its own judgment for that of the Board if "reasonable minds could reach differing conclusions on the same evidence." *Heisig*, 719 F.2d at 1156. However, if the Board "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [Board], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," then its decision cannot be sustained. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983); *see also Smith v. Dalton*, 927 F. Supp. 1, 5 (D.D.C. 1996) ("[N]otwithstanding the deference that must be afforded to the military, the court conducting the review must have sufficient information to determine that the [Board's] decisions were proper.").

"[D]eference to Executive authority does not extend to ignoring basic due process considerations." *Fisher v. United States*, 402 F.3d 1167, 1177 (Fed. Cir. 2005). The reviewing court may examine whether officers and officials of a uniformed service have complied with applicable regulations and whether any failure to do so has operated to the prejudice of the claimant. *See Antonellis v. United States*, __ F.3d __, __, 2013 WL 3746099, *3 (Fed. Cir. 2013) ("[I]f a statute, regulation, or instruction specifies the particular procedure to be followed in personnel actions, and the plaintiff alleges that the required procedure was not followed, a judicial remedy may be available."); *see also Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("The military no less than any other organ of the government is bound by statute, and even when granted unfettered discretion by Congress[,] the military must abide by its own procedural regulations should it choose to promulgate them."); *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed. Cir. 1995); *Sargisson v. United States*, 913 F.2d 918, 921-22 (Fed. Cir. 1990).

## ANALYSIS

Ms. Verbeck contends that her termination was conducted contrary to PHS regulations due to discrepancies between the process pursued by PHS and that prescribed by the Commissioned Corps Personnel Manual ("CCPM"). Pl.'s Mot. at 19. [6] The government has countered that Ms. Verbeck was not entitled to the process described in the CCPM because she was a mere probationary officer, and as such could "be dismissed during [her] probationary period without cause at any time." Def.'s Cross-Mot. at 18. Therefore, the government contends, when PHS dismissed Ms. Verbeck, there was no applicable procedure which would have afforded her the opportunity to respond to or to correct her allegedly unsuitable behavior. *See id.*

The relevant portion of the CCPM describing involuntary separation of probationary officers is CCPM 23.7-I1 (Involuntary Termination During the Probationary Period Served by Officers on Active Duty in the Reserve Corps) Sections D & E,[7] which begins by stating that

> [a]ll individuals called to active duty in the PHS reserve corps are required to serve a 3-year probationary period. During this period, the officer's performance, conduct, dedication to duty, professionalism as a member of a Uniformed Service, flexibility, and willingness to accept new assignments will be monitored closely. . . . At any time during the probationary period, an officer may be separated from active duty for reasons including, but not limited to . . .
>
> (b) Unsuitability, i.e., the officer demonstrates general character traits that make him/her unsuitable for continued service;
>
> (c) Failure to demonstrate the level of performance, conduct, dedication to duty, or professional attitude and attributes expected of an officer in the Uniformed Services . . . .

CCPM 23.7-I1 § D(1).

---

[6]Ms. Verbeck also alleges that her termination was improper because it was motivated by a desire to retaliate upon her for the reports to OSHA she had made earlier in the year of her separation. Pl.'s Mot. at 13-18. The court previously addressed the claim of retaliatory termination and found that it did not have jurisdiction to consider such claims. *See Verbeck II*, 97 Fed. Cl. at 451-52; *Verbeck I*, 89 Fed. Cl. at 61-62. Accordingly, the court will not address this claim further.

[7]Portions of the CCPM have been divided into individual "Instructions" within the same part. The court will use the letter "I" followed by the number of the relevant Instruction to indicate specific portions of the CCPM. For example, CCPM 23.7-I1 refers to Instruction 1 of CCPM 23.7.

7

CCPM 23.7-I1 § E(2)(a) describes detailed procedures for termination of an individual for unsatisfactory performance or conduct, but the CCPM is silent insofar as procedures for termination based upon "unsuitability" alone are concerned. The government has argued that Ms. Verbeck was not terminated for unsatisfactory performance or conduct, but rather for "unsuitability." *See* Hr'g Tr. 35:13-16 (June 13, 2013).[8] As such, the government asserts, she was entitled to no more process than thirty days of notice, pursuant to CCPM 23.7-I1 § D(6). Hr'g Tr. 34:4-12. The court cannot accept either this view of the applicable regulations or this characterization of Ms. Verbeck's termination. In the termination letter sent to then-Lieutenant Commander Verbeck by the Director, Division of Commissioned Personnel of the PHS Commissioned Corps on May 1, 2002, the Director stated that Ms. Verbeck was separated for "a variety of reasons, including unsuitability," but specifically that her "repeated failure to adhere to the *conduct* expected of an officer in a Uniformed Service indicate[d] [her] lack of suitability for continued service." AR-405 (Termination Letter) (emphasis added).[9] In a letter dated June 3, 2002, the Director of DCP again noted that Ms. Verbeck was terminated "due to unsuitability and failure to demonstrate the level of *performance*, *conduct*, and dedication to duty expected." AR-456 (Letter from Rear Admiral Davidson, Director, DCP to David Sheldon, Ms. Verbeck's attorney) (emphasis added). The court therefore determines that Ms. Verbeck was terminated for "conduct," at least in material part, and thus that the procedures listed in CCPM 23.7-I1 § E(2) were applicable.[10]

---

[8]Subsequent references to the transcript of the hearing conducted on June 13, 2013 will omit the date.

[9]The Director's termination letter followed the statement concerning "conduct" with a reference to the authority conferred by CCPM 23.7-I1, directly implicating the conduct-related procedures set out in CCPM 23.7-I1 § E(2). *See* AR-405 (Termination Letter).

[10]Additionally, "unsuitability" within the meaning of CCPM 23.7-I1 § D(1)(b) would have to be manifested in some observable way, and the regulations spell out criteria and procedures expressed in terms of "Unsatisfactory Performance or Conduct:"

Section E.  Procedures

1.  Personnel Orders. Each personnel order calling an applicant or an inactive reserve corps officer to active duty will include the remark: "All reserve corps officers are in probationary status for 3 years following each call to duty (Subchapter CC23.7. INSTRUCTION 1)."

2.  Unsatisfactory Performance or Conduct. The procedures stated in this subsection apply to separation for unsatisfactory performance or conduct after entrance on active duty. Procedures in this subsection fall into two categories: individual cases initiated by the OPDIV or Program, and group probationary reviews initiated by DCP.

Group probationary reviews are based on automated listings of all officers falling within selected call-to-duty dates. It is possible that an officer could

8

be in some stage of the group review process when an individual case is initiated by the OPDIVor Program.  If  an individual case is under consideration while a group review is in process, the individual case will take precedence, and the group review for that particular officer need not be continued.

    a.  Individual cases.  The  OPDIVs or programs to which an officer may be assigned, or their representatives are responsible for initiating separation action whenever it becomes apparent during the probationary period that the officer's performance or conduct is below a level desirable for continued service.  A request for separation must include a justification of the type described in subsection 5.c and 5.d, below, and the officer must be notified when the final justification has been sent to DCP, as described in subsection 5.d, below.  However, the time periods described in subsections 5.c and 5.d do not apply; draft and final justifications should be prepared as expeditiously as possible.

. . .

5.  Status Review Upon Completion of Probation.  Prior to completion of the 3-year probationary period, each officer will be reviewed pursuant to the procedures set forth below.

. . .

    c.  During the next 3-month period (i.e., between 6 and 9 months prior to the end of probation), the OPDIV or Program will prepare and send to DCP, a draft justification for those officers who were recommended for termination.  The justification will describe the conduct and/or performance which is unsatisfactory, how that performance or conduct fails to meet requirements, and what actions have been taken to attempt to improve the performance or conduct.  The justification should include all available documentation of the performance and/or conduct and a description of any discussions held with the officer.

    d.  During the next 2-month period (i.e., between 4 and 6 months prior to the end of probation), the OPDIV or Program will prepare and send to DCP, the final justification for those officers recommended for termination.  The OPDIV or Program should notify the officer in writing that it has officially requested the termination of the officer's commission under the provisions of this INSTRUCTION.  This notice will be delivered to the officer as soon as practicable after the final justification has been sent to DCP.  The OPDIV or Program will make a copy of the final justification available to the office upon request.

PHS is responsible for initiating the process of involuntary separation "whenever it becomes apparent during the probationary period that the officer's performance or conduct is below a level desirable for continued service." CCPM 23.7-I1 § E(2)(a). Upon determining that an officer's service shall be discontinued during the probationary period, PHS is obligated to prepare and submit a justification for the separation, which is to be sent to the officer prior to finalization of the separation. *Id.*

The specific procedures for involuntary separation justifications are laid out in CCPM 23.7-I1 § E(5)(c) and (d). *See* CCPM 23.7-I1 § E(2)(a) ("A request for separation must include a justification of the type described in subsections 5.c and 5.d, below."). Although the timing in subsection 5 can be modified (the timing describes a twelve-month process culminating in retention or separation at the natural close of the probationary period), the procedures otherwise are pertinent. The first step in a separation of an individual is that PHS must "prepare and send to DCP, a draft justification," which "should include all available documentation of the performance and/or conduct and a description of any discussions held with the officer." *Id.* § E(5)(c). This draft justification is then refined into a "final justification," which is again submitted to DCP as well as to the officer in question. *Id.* § E(5)(d). Only after these procedures have been observed may the officer be terminated by DCP.

In the case at hand, PHS failed to follow procedures specified in CCPM 23.7-I1 § E. The record reflects no evidence of any draft justification whatsoever. Although Ms. Verbeck's supervisors, and possibly DCP officials as well, may have been discussing Ms. Verbeck's potential separation amongst themselves for several months, it is evident that the first written communication to DCP was made on April 4, 2002, in what appears to be a final justification letter. AR-338 to 339 (Final Justification). This letter itself is deficient in two pertinent respects: first, it was not provided to Ms. Verbeck during the period of consideration by DCP, and second, it fails to account for or reference Ms. Verbeck's manifestly positive COERs and prior awards for exemplary performance.

COERs are meant to be a "major source of information," and are to be "extensively used in the evaluation of officers." CCPM 25.1-I1 (Commissioned Officers' Effectiveness Report) § C(1), (2). To that end, all boards, including those for involuntary separation, "*must* rely on the report when evaluating officers." *Id.* § C(2) (emphasis added). The COER is not simply a helpful source of information for reviewing performance at the Board level; rather, it is "basic to fulfilling an important supervisory responsibility, that of the discussion of an officer's performance with him/her." *Id.* § C(3). The CCPM specifies that the COER should be used to help officers "overcome perceived performance and/or attitudinal deficiencies," and mandates

---

e. During the next 2-month period (i.e., between 2 and 4 months prior to the end of probation), the Director, DCP, will review the termination request and render a decision to retain on duty or to terminate the commission.

        . . . .

CCPM 23.7-I1 § E.

10

that "an officer's evaluation *must* be discussed with him/her in a formal manner at least once annually, and more frequently, if appropriate." *Id.* Furthermore, "it is expected that problems and/or difficulties *shall be documented*" in a COER. *Id.* § C(4) (emphasis added).

The final justification letter submitted to DCP on April 4, 2002 does not incorporate Ms. Verbeck's COER evaluations, in spite of the fact that they comprise the entirety of the formally documented performance evaluations given to Ms. Verbeck during her tenure. *See* AR-338 to 339 (Final Justification). In fact, while the COERs are uniformly positive in their descriptions of Ms. Verbeck, the final justification letter describes only negative characteristics and incidents. *Id.* For example, the COERs note that Ms. Verbeck "consistently sought out consultation to enhance [her] skills and knowledge base," AR3-S38, but the final justification letter alleges that she was "not receptive to supervision," AR-339. The COERs report that Ms. Verbeck worked "to enhance relationships with coworkers," AR3-S37, and that she helped to create a "positive work environment," AR3-S39, yet the final justification describes an officer who "has difficulty working with others," who "is critical and condescending," and who "attempts to divide the staff in an attempt to meet her own personal objectives," AR-339. Where the COERs note that Ms. Verbeck works "efficiently and accurately[,] saving thousands of dollars in lab costs," AR3-S44, the final justification asserts that instead she has "divert[ed] her attention from her clinical duties [to focus] on collecting information to defend herself or to attack others," AR-339. No COER was produced in 2002 to document Ms. Verbeck's allegedly poor conduct; every COER that was actually issued was entirely favorable.

PHS's failure to execute her termination properly has prejudiced Ms. Verbeck. Given the positive reviews she had received through the COERs and the lack of official notice regarding any concerns PHS had regarding her performance or conduct, Ms. Verbeck was deprived of any opportunity either to cure or to contest her alleged deficiencies. Without any notice of the pending termination request, Ms. Verbeck was denied the process provided for her in CCPM 23.7-I1 §§ D & E. To compound PHS's error in failing to provide notice to Ms. Verbeck of her pending termination, the final justification letter is markedly lacking in its recitation of Ms. Verbeck's recorded performance and conduct. Contrary to the specific requirements of 23.7-I1 § E, the letter does not cite Ms. Verbeck's reviews given to her during her time at PHS. Because it was based upon a skewed version of Ms. Verbeck's service, and did not weigh a rebutting narrative from Ms. Verbeck due to PHS's failure to provide the requisite notice to her, the termination decision was procedurally flawed. The Board's subsequent perfunctory affirmations of this determination have not cured this contravention of the process to which she was entitled by the PHS's own regulations. In its three decisions up to this point, the PHS Correction Board has entirely failed to consider the contravention of PHS regulations. Consequently, the Board's decision must be set aside, and Ms. Verbeck must be reinstated and awarded back pay. *See Antonellis*, __ F.3d __, __, 2013 WL 3746099, at *4 ("[O]ur cases make clear that a personnel decision based on procedural error can lead to an award of back pay in some instances.").

11

## CONCLUSION

For the reasons stated, Ms. Verbeck's motion for judgment on the administrative record is GRANTED, and the government's cross-motion for judgment on the administrative record is DENIED. Pursuant to 28 U.S.C. § 1491(a)(2), the court sets aside the Board's determination that Ms. Verbeck's termination was proper. The court orders that Ms. Verbeck be reinstated to duty at the appropriate rank and awarded back pay and benefits in the appropriate amounts, *i.e.*, subject to applicable offsets.[11] Additionally, the court orders that her PHS Commissioned Corps records be corrected as specified. To effect these actions, the case shall be remitted to the Secretary of Health and Human Services.

The Clerk shall issue final judgment in accord with this disposition.

Plaintiff is awarded her costs of suit.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[11]Perhaps anticipating this result, counsel for the government at the hearing held on June 13, 2013, noted that "Ms. Verbeck when she was terminated had assumed a temporary position of lieutenant commander, which is an 04 rank. At the time she was terminated, however, her permanent rating or her permanent rank was 03." Hr'g Tr. 24:25 to 25:4.

Previously, the PHS organic act provided for temporary promotions. *See* 42 U.S.C. § 211(a) and (k), as amended through July 1, 1986. A subsequent amendment to 42 U.S.C. §§ 204 and 211 in 2010 assimilated Reserve Corps officers into the Regular Corps. *See* Pub. L. No. 111-148, tit. V, § 5210, 124 Stat. 614 (codified at 42 U.S.C. § 204(b)) ("Effective on March 23, 2010, all individuals classified as officers in the Reserve Corps under this section (as this section existed on the day before March 23, 2010) and serving on active duty shall be deemed to be commissioned officers of the Regular Corps").

The court expresses no view as to the applicability of these statutes or Ms. Verbeck's rank upon reinstatement.